UNITED WIRE, METAL AND MACHINE HEALTH AND WELFARE FUND; Jack Stoll; Esther Borja; Javier Restrepo; United Food and Commercial Workers International Union Local 464A, AFL–CIO Group Reimbursement Welfare Plan; Frank Lacatena; Dolores Lacatena; New Jersey Carpenters Welfare Fund; Local # 807 Labor–Management Health Fund; Trustees of the Local # 807 Labor–Management Health Fund; Prosper Alexander; Marie Alexander; District Council of Ironworkers of Northern New Jersey Welfare Fund; Archie G. Ferguson; Ronald W. Jensen; John J. Irvine; Walter Phillips; Michael J. McDermott; Samuel Pacich; Albert J. Irwin; Nicholas J. Andretta, Sr.; Gary Ugaro; Walter F. Steinmetz; John D. Mulvany; Michael W. Featherson; Francis E. Arny; John J. Clark, Sr.; Ronald W. Williams; Daniel J. Perez; Keith E. Zdep; Edward Weidler; Louis Rocco; Raymond J. Rodgers; Francis J. Akesson; Donald J. Banta, Sr.; Charles W. Bird; David F. Brown; Clifford Crooks; Robert T. Cusick; James P. Fitzgerald; Joseph A. Fusaro; Charles Gamba; Richard Gougeon; John Keating; Gerard McCloud; Robert McGee; Alexander McLellan; John Murphy; Laurence O'Brien; Peter O'Conner; Raul Rodriguez; Robert Schweitzer; Robert Sickles; Andrew L. Smith; Richard Sparks; George Sudak; Edward Tedesco; James Toal; Enoch P. McMahan; Local Union 400, IBEW Welfare Fund; Brian Hruska; William Marsh; Charles Work; Harold Rutledge; Ralph Allen; Thomas Vadas; Vincent Worth; Timothy Hill; Ronald Ramsey; John Ireland; James Martin; Michael Almasi; Beverly A. Ruby; Peter Namotka; Daniel Kennedy; George Cole; Walter Davies; Robert Hermann; Frank Hermann; Charles Keller; Dennis Johnson; Connie J. Koehler; Frank O'Day; Vincent La Stella; Donald McNeil; Jean–Louis Pouliot; Nicholas Aemisego; Robert Stahnke; Philip Cerza; Gary

Giorgio; Edward Osowski; Glenn Halvorsen; William Stadelman; Daniel Julio, Jr.; Francis Alexander; Leonard Dahl; Michael Devine; Joseph George; Ralph Jensen; Donald La Brutto; Norman Gramlich; Juan Romero; Joseph Piwoski; Harry Pease, Jr.; Eugene O'Rourke; Paul Niedzinski; Bernard Wall; Stephen Kojac; Charles Krupka; William McCormack; Minor Kennard; Stephen J. Sangle; Donald Schiraldo; John Gacina, III; Brian McCarthy; Charles McNally; Robert Czajowski; Brian Woodall; Jeffrey Stahnke; John Ryan; Ralph Rosamilia, Sr.; Daniel Mugan; Edward Mironski; Michael Middings; Andrew Mahasky; Walter Jelinsky; Albert Gaechter; Louis Di Mascio; Elliott Roseman; Trustees of the Operating Engineers Local 825 Welfare Fund; Richard Hornecker; Teamsters Local 11 Benefit Plan; Trustees of the Teamsters Local 11 Benefit Plan; Katluska Baidal; William Bartel; Gunter Blohm; Angelo Buinno; Betty J. Cairns; Frank Close; Jose Cruz; Santos Garcia; Karen Gensure; Dorothy Larson; Richard Litchfield; Sandra Marino; John Matuszkiewicz; George McClaughlin; Olga Montes; Fernando Perez; Santo Ramos; Martha . Sara; Roxeen Scala; Edmund Scott; Charlie Taylor; Melissa Turi; Sangpo Tsuldin; Cosmo Visentini; NYSA–ILA Welfare Fund; John Bowers; Albert Cernadas; Frank Lonardo; Thomas Popola; James Capo; Joseph N. Barbera; Bart Dimattina; Richard H. O'Neill; Laborers International Union of North America Local 415 Health and Welfare Fund; Sheet Metal Workers Local Union No. 25 Welfare Fund; Jeffrey Stajek; James Luciano; John A. Freudenreich, Sr.; Thomas Smiech; Joseph McCallion; Daniel Smith, Jr.; James McKay; Mark Cox; Trustees of the Teamsters Local 641 Welfare Fund; Carlos Rocha; George Koester; Carmela Ferens; Khoonrajie Raghubans; Phillip Savittieri; Earl Patterson; Robert Reeder; Local 1245, Local 1245 Health Fund; Anthony Rizzo; Joseph Abbate; Joseph Massoud; Ralph Mastrangelo; Trustees of the Welfare Trust Fund, Local Union No. 475; Willie A. Barnes; Herman Geiger; Vinston Lee King; Kevin E. Kline; Robert L. Rosa; William Brennan; James Murphy, Jr.; Patricia McElligott; Kevin McCormick; Patrick Ryan, Jr.; Anthony E. Smith; Robert Laveratt; John S. Wittek; John McQuilken; John Montesano; Roy E. Frank; John O'Neill, Jr.; Frank Robinson; Dale Schaefer; John J. Serra; Donald Sheridan; Wenceslao Soto; Michael J. Russo; Joseph P. Murphy, Jr.; Calvin R. Sutton, III; Ronald J. Zakarzewski; Frank Whitney, Sr.; Jack Nachtigall; Lawrence Parkin; Edison Rodriquez; William Moran; Vincent Doffont; George Stout; Brian Lubeck; Americo Guglielmo; David Vadas; Christopher Andrewski; David Jenkins; Arthur Ackerman; Kenneth Finton; Ramon Lorenzo; Wesley Sanderson; Charles Newman, III; Leonard Iarossi; George Rossi; William Skieczius; John Hancock; Edward Thorne; Joseph Tagliadia; Michael Machanska; Steve Parlacask

v.

MORRISTOWN MEMORIAL HOSPITAL; Frances J. Dunston, New Jersey Commissioner of Health; New Jersey State Department of Health; New Jersey Hospital Rate Setting Commission; New Jersey Commissioner of Health; Frances Dunston; Memorial Hospital of Burlington County; The Medical Center of Ocean County; Kimball Medical Center; Mercer Medical Center; Our Lady of Lourdes Hospital; Princeton Medical Center; Hospital of Salem County; Newcomb Medical Center; Riverview Medical Center; Community Medical Center; Shore Memorial Hospital; Burdette Tomlin Memorial Hospital; Christ Hospital; Newark Beth Israel Medical Center; St. Joseph's Hospital; Wayne General Hospital; South Jersey Hospital System; Cooper Hospital; West Jersey Health Systems; Atlantic City Medical Center; Union Memorial Hospital; Elizabeth General Hospital; Englewood Hospital; Robert Wood Johnson University Hospital; Barnert Memorial Hospi-

tal; Passaic General Hospital; Rahway Hospital; Valley Hospital; Holy Name Hospital; St. Peter's Medical Center; Somerset Medical Center; Overlook Hospital; St. Elizabeth Hospital; Dover General Medical Center; Hunterdon Medical Center; Chilton Memorial Hospital; Kessler Memorial Hospital; Freehold Area Hosp.; Kennedy Memorial Hospital; University Hospital; Underwood Memorial Hospital; Jersey City Medical Center; St. Joseph's Hospital; St. Barnabas Medical Center; Raritan Bay Medical Center; Clara Maass Medical Center; St. Clare's/Riverside Medical Center; John F. Kennedy Medical Center; Hackettstown Community Hospital; Zurbrugg Memorial Hospital; Jersey Shore Medical Center; Monmouth Medical Ctr; Newton Memorial Hospital; University of Medicine & Dentistry of New Jersey; Deborah Heart and Lung Center; Hospital Center at Orange; Dover General Hospital; West Jersey Health System; Raritan Bay Medical Center; Hackensack Medical Center; South Amboy Memorial Hospital; The Mountainside Hospital; St. Francis Hospital; Bayonne Hospital; Muhlenberg Hospital; Centrastate (FAH) Hospital; St. James Hospital; Kennedy Memorial Hospital at Saddle Brook; Administrator of the New Jersey Health Care Trust Fund; New Jersey Department of Human Services (Division) of Medical Assistance and Health Services; Elizabeth General Medical Center; Dover General Medical Center; Irvington General Hospital; Union Hospital; Warren Hospital; Columbus Hospital; East Orange General Hospital; Francis Dubeau; Lillian Dubeau; Bayshore Community Hospital; New Jersey Hospital Association; Bergen Pines County Hospital; Community Memorial Hospital; Greenville Hospital; Montclair Community (Hospital) Palisades General Hospital; Passaic Beth Israel Hospital; Raritan Bay Medical Center/Perth Amboy Division; Riverview Medical Center; Southern Ocean County Hospital; St. Mary's Hospital; The General Hospital Center at Passaic; Wallkill

Valley Hospital and Health Centers; St. Mary's Hospital (Passaic); United Hospital; Pascack Valley Hospital; West Hudson Hospital; Johnson University Hospital; Administrator of the New Jersey Health Care Trust Fund; New Jersey Department of Human Services Division of Medical Assistance and Health Services;

New Jersey Hospital; New Jersey Hospital Association, Intervenors–Defendants.

UNITED WIRE, METAL AND MACHINE HEALTH AND WELFARE FUND; Esther Borja

v.

ST. MARY'S HOSPITAL; New Jersey Commissioner of Health; New Jersey State Department of Health; New Jersey Hospital Rate Setting Commission; Frances J. Dunston;

UNITED WIRE, METAL AND MACHINE HEALTH AND WELFARE FUND; Javier Restrepo

v.

ST. JOSEPH'S HOSPITAL AND MEDICAL CENTER; Frances J. Dunston, in her capacity as New Jersey Commissioner of Health; New Jersey State Department of Health; New Jersey Hospital Rate Setting Commission.

UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, LOCAL 464A, AFL–CIO GROUP REIMBURSEMENT WELFARE PLAN; Frank Lacatena; Dolores Lacatena

v.

WAYNE GENERAL HOSPITAL; Frances J. Dunston; New Jersey Commissioner of Health; New Jersey State Department of Health; New Jersey Hospital Rate Setting Commission.

DISTRICT COUNCIL OF IRONWORKERS OF NORTHERN NEW JERSEY WELFARE FUND; Archie G. Ferguson; Ronald W. Jensen; John J. Irvine; Walter Phillips; Michael J. McDermott; Samuel Pacich; Albert J. Irwin; Nich-

olas J. Andretta, Sr.; Gary Ugaro; Walter F. Steinmetz; John D. Mulvaney; Michael W. Featherson; Francis E. Arny; John J. Clark, Sr.; Ronald W. Williams; Daniel J. Perez; Keith E. Zdep; Edward Weidler; Louis Rocco; Raymond J. Rodgers; Francis J. Akesson; Donald J. Banta, Sr.; Charles W. Bird; David Brown; Clifford Crooks; Robert T. Cusick; James P. Fitzgerald; Joseph A. Fusaro; Charles Gamba; Richard Gougeon; John Keating; Gerard McCloud; Robert McGee; Alexander McLellan; John Murphy; Laurence O'Brien; Peter O'Conner; Raul Rodriguez; Robert Schweitzer; Robert Sickles; Andrew L. Smith; Richard Sparks; George Sudak; Edward Tedesco; James Toal; Enoch P. McMahan

v.

Frances J. DUNSTON, in her capacity as New Jersey Commissioner of Health; New Jersey State Department of Health; New Jersey Hospital Rate Setting Commission; Deborah Heart and Lung Center; Hunterdon Medical Center; St. Francis Hospital; Hospital Center at Orange; St. Peter's Medical Center; St. Clare's/Riverside Medical Center; John F. Kennedy Medical Center; Dover General Hospital; St. Barnabas Medical Center; Valley Hospital; Overlook Hospital; Rahway Hospital; Newton Memorial Hospital; West Jersey Health System; Raritan Bay Medical Center; Hackensack Medical Center; Clara Maass Medical Center; Holy Name Hospital; Newark Beth Israel Medical Center; Bayonne Hospital; Chilton Memorial Hospital; St. Joseph's Hospital; Muhlenberg Hospital; Community Med Center; Christ Hospital; South Amboy Memorial Hospital; Centrastate (FAH) Hospital; Wayne General Hospital; Princeton Medical Center; St. James Hospital, a/k/a Cathedral Health Services, Inc.; Mountainside Hospital; Passaic General Hospital;

New Jersey Hospital Association, Intervenor/Defendant.

## NEW JERSEY CARPENTERS WELFARE FUND

v.

Frances J. DUNSTON, in her capacity as New Jersey Commissioner of Health; New Jersey State Department of Health; New Jersey Hospital Rate Setting Commission; South Jersey Hospital System; Cooper Hospital; West Jersey Health Systems; Atlantic City Medical Center; Memorial Hospital of Burlington County; The Medical Center of Ocean County; Kimball Medical Center; Mercer Medical Center; Our Lady of Lourdes; Princeton Medical Center; Hospital of Salem County; Newcomb Medical Center; Riverview Medical Center; Community Medical Center; Shore Memorial Hospital; Burdette Tomlin Memorial; Christ Hospital; Morristown Memorial Hospital; Newark Beth Israel Medical Center; Wayne General Hospital; Union Memorial Hospital; Elizabeth General Hospital; Englewood Hospital; Robert Wood Johnson University Hospital; Barnert Memorial Hospital; Passaic General Hospital; Rahway Hospital; The Valley Hospital; Holy Name Hospital; St. Peter's Medical Center; Somerset Medical Center; Overlook Hospital; St. Elizabeth Hospital; Dover General Medical Center; Hunterdon Medical Center; Chilton Memorial Hospital; Kessler Memorial Hospital; Freehold Area Hospital; Kennedy Memorial Hospital; University Hospital; Underwood Memorial Hospital; Jersey City Medical Center; St. Joseph's Hospital; St. Barnabas Medical Center; Raritan Bay Medical Center; Clara Maass Medical Center; St. Clare's/Riverside Medical Center; John F. Kennedy Medical Center; Hackettstown Community Hospital; Zurbrugg Memorial Hospital; Jersey Shore Medical Center; Monmouth Medical Center; Newton Memorial Hospital;

New Jersey Hospital, New Jersey Hospital Association, Intervenor/Defendant.

LOCAL # 807 LABOR–MANAGEMENT HEALTH FUND; Trustees of the Local # 807 Labor–Management Health Fund; Prosper Alexander; Marie Alexander

v.

UNIVERSITY HOSPITAL; University of Medicine & Dentistry of New Jersey; Frances J. Dunston, in her capacity as New Jersey Commissioner of Health; New Jersey State Department of Health; New Jersey Hospital Rate Setting Commission.

LOCAL UNION 400, IBEW WELFARE FUND; Brian Hruska; William Marsh; Charles Work; Harold Rutledge; Ralph Allen; Thomas Vadas; Vincent Worth; Timothy Hill; Ronald Ramsey; John Ireland; James Martin

v.

Frances J. DUNSTON, in her capacity as New Jersey Commissioner of Health; New Jersey State Department of Health; New Jersey Hospital Rate Setting Commission; The Medical Center of Ocean County; Riverview Medical Center; Community Medical Center; Jersey Shore Medical Center; Kimball Medical Center; Monmouth Medical Center,

New Jersey Hospital Association, Intervenor/Defendant.

OVERLOOK HOSPITAL

v.

Frances DUBEAU; Lillian Dubeau.

LABORERS INTERNATIONAL UNION OF NORTH AMERICA LOCAL 415 HEALTH AND WELFARE FUND

v.

Frances J. DUNSTON, in her capacity as New Jersey Commissioner of Health; New Jersey State Department of Health; New Jersey Hospital Rate Setting Commission.

NYSA–ILA·· WELFARE FUND, by its Trustees; John Bowers, Trustee; Albert Cernadas, Trustee; Frank Lonardo, Trustee; Thomas Popola, Trustee; James Capo, Trustee; Joseph N. Barbera, Trustee; Bart Dimattina, Trustee; Richard H. O'Neill, Trustee

v.

Frances J. DUNSTON, in her capacity as New Jersey Commissioner of Health; New Jersey State Department of Health; New Jersey Hospital Rate Setting Commission; Columbus Hospital; East Orange General Hospital; St. James Hospital; University Hospital; Individually and as Class Representatives of Hospitals in the State of New Jersey; New Jersey Hospital Association, as Class representative of Hospital in the State of New Jersey.

SHEET METAL WORKERS LOCAL UNION NO. 25 WELFARE FUND; Jeffrey Stajek; James Luciano; John A. Freudenreich, Sr.; Thomas Smiech; Joseph McCallion; Daniel Smith, Jr.; James McKay; Mark Cox

v.

Frances J. DUNSTON, in her capacity of New Jersey Commissioner of Health; New Jersey State Department of Health; New Jersey Hospital Rate Setting Commission; Administrator of the New Jersey Health Care Trust Fund; New Jersey Department of Human Services (Division) of Medical Assistance and Health Services; New Jersey Hospital Association; St. Barnabas Medical Center; Holy Name Hospital; Hackensack Medical Center; West Hudson Hospital; Overlook Hospital; John F. Kennedy Medical Center; Hunterdon Medical Center; Morristown Memorial Hospital; Irvington General Hospital; Clara Maass Medical Center.

1184

TRUSTEES OF THE OPERATING EN-
GINEERS LOCAL 825 WELFARE
FUND; Richard Hornecker

v.

Frances J. DUNSTON, in her capacity as
New Jersey Commissioner of Health;
New Jersey State Department of Health;
New Jersey Hospital Rate Setting Com-
mission; Administrator of the New Jer-
sey Health Care Trust Fund; New Jer-
sey Department of Human Services, Di-
vision of Medical Assistance and Health
Services.

TEAMSTERS LOCAL 11 BENEFIT
FUND; Trustees of the Teamsters Local
11 Benefit Plan; Katluska Baidal; Wil-
liam Bartell; Gunter Blohm; Angelo
Buinno; Betty J. Cairns; Frank Close;
Jose Cruz; Santos Garcia; Karen Gen-
sure; Dorothy Larson; Richard Litch-
field; Sandra Marino; John Matusz-
kiewicz; George McClaughlin; Olga
Montes; Fernando Perez; Santo Ramos;
Martha Sara; Roxeen Scala; Edmund
Scott; Charlie Taylor; Melissa Turi;
Sangpo Tsuldin; Cosmo Visentini

v.

BAYSHORE COMMUNITY HOSPITAL;
Chilton Memorial Hospital; Clara
Maass Medical Center; Dover General
Hospital; Elizabeth General Medical
Center; Englewood Hospital; Holy
Name Hospital; Irvington General Hos-
pital; Jersey City Medical Center; Pas-
saic General Hospital; St. Francis Hos-
pital; St. Peter's Medical Center; Som-
erset Medical Center; Union Hospital;
United Hospital; University Hospital;
Valley Hospital; Warren Hospital;
Frances J. Dunston, in her capacity as
New Jersey Commissioner of Health;
New Jersey State Department of Health;
New Jersey Hospital Rate Setting Com-
mission.

TRUSTEES OF THE WELFARE TRUST
FUND, LOCAL UNION NO. 475; Willie
A. Barnes; Herman Geiger; Vinston
Lee King; Kevin E. Kline; Robert L.
Rosa; William Brennan; James Mur-
phy, Jr.; Patricia McElligott; Kevin
McCormick; Patrick Ryan, Jr.; Antho-
ny E. Smith; Robert Laveratt; John S.
Wittek; John McQuilken; John Montes-
ano; Roy E. Frank; John O'Neill, Jr.;
Frank Robinson; Dale Schaefer; John
J. Serra; Donald Sheridan; Wenceslao
Soto; Michael J. Russo; Joseph P. Mur-
phy, Jr.; Calvin R. Sutton, III; Ronald J.
Zakarzewski; Frank Whitney, Sr.; Jack
Nachtigall; Lawrence Parkin; Edison
Rodriguez; William Moran; Vincent
Doffont

v.

Frances J. DUNSTON, in her capacity as
New Jersey Commissioner of Health;
New Jersey State Department of Health;
New Jersey Hospital Rate Setting Com-
mission; Administrator of the New Jer-
sey Health Care Trust Fund; New Jer-
sey Department of Human Services, Di-
vision of Medical Assistance and Health
Services; West Hudson Hospital; Uni-
versity of Medicine & Dentistry; Over-
look Hospital; Morristown Memorial
Hospital; Union Hospital; Riverview
Medical Center; Northern Ocean Hospi-
tal System; Community Medical Center;
Hospital Center at Orange; Hunterdon
Medical Center; Warren Hospital; Cen-
trastate Medical Center; Somerset Med-
ical Center; Robert Wood Johnson Uni-
versity; The Medical Center of Ocean
County; Jersey Shore Medical Center;

Columbus Hospital; John F. Kennedy Medical Center; Clara Maass Medical Center.

TEAMSTERS LOCAL 641 WELFARE FUND; Carlos Rocha; George Koester; Carmela Ferens; Khoonrajie Raghubans; Phillip Savittieri; Earl Patterson; Robert Reeder

v.

Frances J. DUNSTON, in her capacity as New Jersey Commissioner of Health; New Jersey State Department of Health; New Jersey Hospital Rate Setting Commission; Medical Center of Ocean County; St. Barnabas Medical Center; Clara Maass Medical Center; St. Elizabeth Hospital; Passaic General Hospital.

LOCAL 1245 HEALTH FUND; Local 1245 Bakery and Specialty Health Fund; James Arbolino; Anthony Rocco; Harold Polsky; Nevio Manciini; Willie Sconiers; Irene Hickey; Kathleen Rodriguez; William Clackworthy; Edward Nelson; Patricia Conrad; Ronald Cozzo; Holly Ann Culbert; Joachim Schaffranietz; Hubert Chase; Robert Bauman; Russell Schwartz; Jean Jacques Kervan; Arthur Beyer

v.

Frances J. DUNSTON, in her capacity as New Jersey Commissioner of Health; New Jersey State Department of Health; New Jersey Hospital Rate Setting Commission; Dover General Hospital; The Medical Center of Ocean County; Saint Barnabas Medical Center; Union Hospital; John F. Kennedy Medical Center; Englewood Hospital; Morristown Memorial Hospital; Centrastate; Saint Peter's Medical Center; Saint Mary's Hospital; Meadowlands Hospital and Medical Center; Jersey Shore Medical Center; Kennedy Memorial Hospital; Passaic General Hospital.

Anthony RIZZO; Joseph Abbate; Joseph Massoud; Ralph Mastrangelo, as Trustees of the Local 945, I.B.T. Welfare Fund

v.

BARNERT MEMORIAL HOSPITAL CENTER; Bayonne Hospital; Bayshore Community Hospital; Bergen Pines County Hospital; Centrastate Medical Center; Chilton Memorial Hospital; Christ Hospital; Clara Maass Medical Center; Columbus Hospital; Community Memorial Hospital; Dover General Hospital & Medical Center; Elizabeth General Medical Center; Greenville Hospital; Hackettstown Community Hospital; Holy Name Hospital; Irvington General Hospital; Jersey Shore Medical Center; John F. Kennedy Medical Center; Kennedy Memorial Hospitals at Saddle Brook; Kimball Medical Center; Mercer Medical Center; Montclair Community (Hospital); Morristown Memorial Hospital; Newton Memorial Hospital; Overlook Hospital; Palisades General Hospital; Pascack Valley Hospital; Passaic Beth Israel Hospital; Rahway Hospital; Raritan Bay Medical Center/Perth Amboy Division; Riverview Medical Center; Robert Wood Johnson University Hospital; Southern Ocean County Hospital; St. Mary's Hospital (Passaic); St. Joseph's Hospital & Medical Center; St. Francis Medical Center; St. Elizabeth Hospital; St. Peter's Medical Center; The General Hospital Center at Passaic; Union Hospital; University Hospital; University of Medicine & Dentistry of New Jersey; Valley Hospital; Wallkill Valley Hospital and Health Centers; Warren Hospi-

tal; Wayne General Hospital; Frances J. Dunston, in her capacity as New Jersey Commissioner of Health; New Jersey State Department of Health; New Jersey Hospital Rate Setting Commission.

NEWCOMB MEDICAL CENTER

v.

Jennis CARPENTER; Alice Carpenter, his wife, jointly, severally and in the alternative Defendants/Third Party Plaintiffs,

v.

Frances J. DUNSTON; New Jersey State Department of Health; New Jersey Hospital Rate Setting Commission; Administrator of the New Jersey Health Care Trust Fund; New Jersey Department of Human Services, Division of Medical Assistance and Health Services Third Party Defendants.

NEWCOMB MEDICAL CENTER

v.

Shana TRIPP; Charles Tripp, jointly, severally and in the alternative Defendants/Third Party Plaintiffs,

v.

NEW JERSEY STATE DEPARTMENT OF HEALTH; New Jersey Hospital Rate Setting Commission; Administrator of the New Jersey Health Care Trust Fund; New Jersey Department of Human Services, Division of Medical Assistance and Health Services; Frances J. Dunston, in her capacity as New Jersey Commissioner of Health, Third Party Defendants.

NEWCOMB MEDICAL CENTER

v.

Fred KUEKEN, Defendant/Third Party Plaintiff,

v.

Frances J. DUNSTON; New Jersey State Department of Health; New Jersey Hospital Rate Setting Commission; Administrator of the New Jersey Health Care Trust Fund; New Jersey Department of Human Services, Division of Medical Assistance and Health Services, Third Party Defendants,

New Jersey Hospital Association; Bayshore Community Hospital; Monmouth Medical Center; Pascack Valley Hospital; Riverview Medical Center; Kennedy Memorial Hospitals at Saddle Brook, Inc.; William B. Kessler Memorial Hospital; St. Francis Hospital; South Jersey Hospital System; Helene Fuld Medical Center; Newton Memorial Hospital; The Medical Center of Ocean County; Bayonne Hospital; Kennedy Memorial Hospitals–University Medical Center; South Amboy Memorial Hospital; Underwood Memorial Hospital; Muhlenberg Regional Medical Center; Englewood Hospital; Zurbrugg Memorial Hospital; St. Mary Hospital; Community Medical Center; Hunterdon Medical Center; St. Michael's Medical Center; The Mercer Medical Center; St. Peter's Medical Center; Jersey Shore Medical Center; Irvington General Hospital; John F. Kennedy Hospital; Our Lady of Lourdes Medical Center; Overlook Hospital; Raritan Bay Medical Center; St. Elizabeth Hospital; Wayne General Hospital; Barnert Hospital; Atlantic City Medical Center; Dover General Hospital & Medical Center; Holy Name Hospital; The Hospital at Orange; St. Clare's/Riverside Medical Center; Clara Maas Medical Center; Deborah Heart & Lung Center; Rahway Hospital; West Jersey Health System; Hackensack Medical Center; Newark Beth–Israel Medical Center; St. James Hospital; St. Joseph's Hospital & Medical Center; Christ Hospital; Chilton Memorial Hospital; East Orange General Hospital; Columbus Hospital; Cooper Hospital/University Medical Center; Memorial Hospital of Burlington County Me-

morial Health Alliance; Medical Center at Princeton; St. Joseph's Hospital; Shore Memorial Hospital; Robert Wood Johnson University Hospital; Burdette Tomlin Memorial Hospital; Somerset Medical Center; Mountainside Hospital; Union Hospital; United Hospitals Medical Center at Passaic; and Morristown Memorial Hospital, Appellants.

Nos. 92–5317, 92–5319, 92–5320, 92–5341, 92–5343, 92–5345, 92–5352, 92–5354, and 92–5355.

United States Court of Appeals, Third Circuit.

Argued Sept. 18, 1992.

Decided May 14, 1993.

Robert J. Del Tufo, Atty. Gen., Edward J. Dauber, Executive Asst. Atty. Gen., Benjamin Clarke (argued), Sr. Deputy Atty. Gen., Michael J. Haas, Todd A. Wigder, Deputys Atty. Gen., Trenton, NJ, for State appellants.

Frank R. Ciesla (argued), Elizabeth Dusaniwskyj, Girodano, Halleran & Ciesla, Middletown, NJ, for appellant New Jersey Hosp. Ass'n and the appellant Hospitals.

Harold Kreiger (argued), Sanford Browde, Kreiger & Browde, Jersey City, NY, for plaintiffs-appellees, Local 464A, United Food and Commercial Workers Union Group Reimbursement Welfare Plan, Frank Lacatena and Dolores Lacatena.

Albert G. Kroll, Verona, NJ, for New Jersey Carpenters Welfare Fund and Dist. Council of Ironworkers of Northern New Jersey Welfare Fund.

Donato Caruso (argued), C. Peter Lambos, Lambos & Giardino, Ernest L. Mathews, Jr., Kevin Marrinan, Law Offices of Thomas W. Gleason, New York, NY co-counsel to plaintiffs-appellees-cross-appellants NYSA–ILA Welfare Fund and Its Trustees.

Ronald E. Wiss (argued), Herbert New, Clifton, NJ, for appellee-cross-appellant Local 807 Labor–Management Health Fund.

David A. Schrader, Wolff & Samson, P.A., Roseland, NJ, for plaintiff-appellees United Wire, Metal & Mach. Health and Welfare Fund and Operating Engineers Local 825 Welfare Fund.

Thomas V. Jardine, Jardine & Pagano, Springfield, NJ, for District Council of Ironworkers of Northern New Jersey Welfare Fund, et al.

Before STAPLETON, SCIRICA, and NYGAARD, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

Appellees, several self-insured employee benefit plans and a number of individual participants in those plans ("the plans"), brought this action seeking an injunction against the application to them of New Jersey's then current statutory scheme for setting hospital rates. They also sought restitution of monies paid under protest pursuant to that statutory scheme. Appellees argue both that the New Jersey statute was preempted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*, as amended ("ERISA"), and that the statute worked an unconstitutional taking of property without just compensation. Appellants are numerous New Jersey hospitals, various agencies and officials of the state of New Jersey and, as an intervening party, the New Jersey Hospital Association ("the defendants").

The district court entered summary judgment in favor of the plans on their ERISA preemption claim and enjoined the enforcement of the statute as it applied to them.

The injunction was stayed, pending this appeal. The district court also entered summary judgment in favor of the defendants on the plans' constitutional claims, and declined to reach the question of restitution. The defendants appeal, and the plans cross-appeal.

We will reverse the summary judgment on the ERISA preemption claim and vacate the injunction. We will affirm the summary judgment on the constitutional claims, and remand the case to the district court with instructions that judgment be entered for the defendants.

## I.

The statutory and regulatory regime in question is found in the New Jersey Health Care Facilities Planning Act of 1971, as amended by the Health Care Cost Reduction Act of 1978, N.J.Stat.Ann. 26:2H–1 et seq., (both shall be collectively referred to as "Act") and the attending regulations, N.J.Admin.Code 8:31B et seq.

In 1978, New Jersey enacted a revised rate setting system, Chapter 83, the dual purpose of which was to "contain the rising costs of health care services, and to ensure the financial solvency of hospitals." N.J.Stat.Ann. 26:2H–1. Under this prospective rate setting system, various medical procedures are divided into "diagnostic related groups" ("DRGs"), and a rate is assigned to each DRG. A particular hospital's DRG rate consists of a weighted average of the costs incurred by the hospital in treating a given condition and the average cost incurred by hospitals throughout the state to treat that condition. The system thus penalizes hospitals that incur costs greater than the state wide average and rewards hospitals that provide more efficient service for a particular DRG. Patients in the same DRG at a particular hospital pay the same bill regardless of the duration of their stays and the demands they make on the resources of the hospital.

The DRG rate is the base rate under New Jersey's system. A patient's bill will have other components, and it is these components that the plans challenge as inconsistent with ERISA. Hospitals in New Jersey are required by law to provide treatment for patients who cannot pay their bills. N.J.Admin.Code 8:436–5.2(c). Emergency services for the indigent are required by federal law as well. Thus, one cost of doing business for New Jersey hospitals is the cost of providing "uncompensated care." In order to pay for this care and to provide financial relief to those hospitals that provide more than their share of uncompensated care, a state wide charge is added to the DRG, and the resulting revenue is distributed in proportion to the uncompensated care provided by each hospital.

An additional surcharge is designed to compensate hospitals for the losses they incur when treating patients covered by Medicare. Hospitals that treat Medicare patients can charge those patients only the amount allotted by the federal Medicare agency for the particular treatment provided. Medicare now provides reimbursement at levels below the DRG rates. To enable New Jersey hospitals to make up for the resulting revenue shortfall, the current New Jersey system allows hospitals to include in their billings to non-Medicare patients an amount necessary to recover the difference between the Medicare rate of payment and the DRG rate.

Chapter 83 also grants discounts to certain classes of payors. The relevant section provides in part:

All payment rates shall be equitable for each payor or class of payors without discrimination or individual preference except for quantifiable economic benefits rendered to the institution or to the health care delivery system taken as a whole. In addition to other such benefits which the commission may consider, it shall consider the following, if found to be quantifiable: (1) degree of promptness and volume of payments to hospitals so that hospitals are provided with funds for current financing of their services; and (2) broad provision of health insurance coverages which are not self-supporting. In determining the quantifiable economic benefits to which consideration shall be given in approving payment rates, the commission may consider overall financial benefits to society

which are provided by programs offered by a payor or class of payors.
26:2H–18b N.J.Stat.Ann. Pursuant to this provision, the commission granted a 2.2% discount to high-volume plans such as Blue Cross and granted an 11% discount to plans with open enrollment. Patients who do not belong to plans that received these discounts are billed at an increased rate to allow hospitals to recover the income lost by virtue of the discount. One of the plaintiff plans has applied for a discount under this portion of Chapter 83, but the commission has not yet ruled on its application.[1]

## II.

■ At the threshold of our consideration we must determine whether this case is moot. The regulatory scheme we have just described was superseded by new state legislation on January 1, 1993. As we have noted, however, the plans seek not only an injunction against enforcement of the (now superseded) Act, but also restitution of monies paid by appellees pursuant to the Act while it was in effect. If the Act is infirm for either of the reasons asserted, the claim of restitution remains viable even though an injunction is no longer necessary. In order to adjudicate the merits of the restitution claim, we must determine if the monies were paid pursuant to an unlawful statutory scheme.[2] We thus turn our attention to an evaluation of the lawfulness of the Act.

## III.

■ For the reasons set forth by the district court in its opinion, we find that the extra costs paid by the plans pursuant to the Act do not constitute an unlawful taking of property without just compensation. See, *United Wire, Health & Welfare Fund v. Morristown*, 793 F.Supp. 524, 540–42 (D.N.J. 1992).

In *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), the Supreme Court utilized a three prong analysis to determine whether a governmental regulation constituted a taking. The *Penn Central* analysis directs our attention to (i) the character of the governmental action; (ii) the economic impact of the regulation on the claimant; and (iii) the extent to which the regulation has interfered with investment backed expectations. *Penn Central* at 124, 98 S.Ct. at 2659. Regarding the character of the government action, we conclude that New Jersey "does

---

1. Individuals and third party payors can challenge a bill, through appeal, for such things as an alleged incorrect assignment of a DRG. Only an uninsured individual whose DRG bill exceeds his or her itemized medical costs by $250 may appeal "in exceptional cases of DRG assignments which, although technically correct, may produce grossly inequitable or excessive payments.... Upon demonstration, by substantial evidence, that application of the DRG system would result in inequitable consequences for the patient, the qualified utilization review organization may direct that payment be based on an alternative to the DRG rate (for example, charges)." N.J.Admin. Code 8:31B–3.78(a)viii. Unlike the surcharges to offset the costs of indigent care, Medicare, and payor discounts, the provision of Chapter 83 that allows some uninsured individuals to reduce their bills does not result in a specific surcharge that is added to the bills of other paying customers. This equitable over-ride for some uninsured individuals does not single out participants in ERISA plans for special treatment. It is not available to any individual who is entitled to reimbursement of medical expenses from any third party payor.

The record does not disclose how many uninsured individuals have filed appeals under the

equitable over-ride provision, and we find no record basis for the suggestion that the "transparent goal ... of this appeal process" is to impose "the lion's share of [the cost of] caring for the uninsured" on New Jersey's ERISA plans. Dissenting Op., pp. 1198, 1199.

2. The plans assert that 29 U.S.C. § 1132(a) and federal common law give them a right to recover the amounts they have paid to the hospitals under protest. The district court did not expressly determine whether § 1132(a) or the federal common law provided a right to restitution under the circumstances of this case. Its opinion, however, states that it "declines to exercise its pendent and supplemental jurisdiction over plaintiffs' restitution claims," 793 F.Supp. at 542, perhaps indicating that the district court may have viewed state law as providing the plaintiffs' only possible remedy. In view of our ultimate conclusion that chapter 83 is not preempted, we have no occasion to reach this issue. It is sufficient for our purposes to note that a case or controversy remains between the parties; the preemption issue is not moot because the plaintiffs make a claim for restitution, and an essential element of that claim is that ERISA's preemption provision has been violated.

not physically invade or permanently appropriate any of the [plan's] assets for its own use," but rather "adjusts the benefits and burdens of economic life to promote the common good". *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 225, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986). Similarly, the economic impact of the Act upon the appellees indicates that no taking has occurred. While appellees have been deprived of money by operation of the Act, the determination of the amount owed was not randomly generated, but was rather "directly related to the individual [appellee's] hospital bill." *United Wire*, 793 F.Supp. at 542. Finally, given the historically heavy and constant regulation of health care in New Jersey, we cannot say that the Act interfered with the plans' "investment backed expectations." We thus affirm the district court's summary judgment for the defendants on the constitutional claim.

### IV.

Whether the Act is preempted by ERISA is a somewhat thornier question. Section 514(a) of ERISA provides that, with some exceptions that do not apply in this case, ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. It is undisputed that the plans are covered by ERISA, and so the question to be determined is whether the Act "relate[s] to" the plans in a way that necessitates preemption. We find that the Act does not relate to the plans in a way that triggers ERISA's preemption clause.

The preemption clause of ERISA is notable for its breadth, and manifests Congress's intention to establish pension plan regulation as an exclusively federal concern. *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981). The Supreme Court has noted that a state law "relates to" an ERISA governed plan, within the meaning of § 514(a)'s preemptive reach, "if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines*, 463 U.S. 85, 97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983). The Court in *Shaw* noted, however, that "[s]ome state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." 463 U.S. at 100, n. 21, 103 S.Ct. at 2901 n. 21.

In determining whether the New Jersey scheme of regulating hospital rates is preempted by ERISA, "as in any preemption analysis, 'the purpose of Congress is the ultimate touchstone.'" *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 747, 105 S.Ct. 2380, 2393, 85 L.Ed.2d 728 (1985) (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504, 98 S.Ct. 1185, 1190, 55 L.Ed.2d 443 (1978)). The Supreme Court discussed at length the Congressional intent behind the ERISA preemption clause in *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). In *Fort Halifax* the Court was faced with the question of whether ERISA preempted a Maine statute requiring employers, in the event of a plant closing, to provide a one-time severance payment to employees not covered by an express contract providing for severance pay. In the course of holding that the Maine statute was not preempted, the Court explained the Congressional intent behind ERISA's preemption clause:

> [A]n employer that makes a commitment systematically to pay certain benefits undertakes a host of obligations, such as determining the eligibility of claimants, calculating benefit levels, making disbursements, monitoring the availability of funds for benefit payment, and keeping appropriate records in order to comply with applicable reporting requirements. The most efficient way to meet these responsibilities is to establish a uniform administrative scheme, which provides a set of standard procedures to guide processing of claims and disbursement of benefits. Such a system is difficult to achieve, however, if a benefit plan is subject to differing regulatory requirements in differing States. A plan would be required to keep certain records in some States but not in others; to make certain benefits available in some States but not in others; to process claims in a certain way in some States but not in others; and to comply with certain fiducia-

ry standards in some States but not in others.

\* \* \* \* \* \*

It is thus clear that ERISA's pre-emption provision was prompted by recognition that employers establishing and maintaining employee benefit plans are faced with the task of coordinating complex administrative activities. A patch-work scheme of regulation would introduce considerable inefficiencies in benefit program operation, which might lead those employers with existing plans to reduce benefits, and those without such plans to refrain from adopting them. Pre-emption ensures that the administrative practices of a benefit plan will be governed by only a single set of regulations.

*Fort Halifax,* 482 U.S. at 9, 11, 107 S.Ct. at 2216, 2217. It is with this Congressional

3. *See, e.g., Bricklayers Local 33 v. America's Marble Source,* 950 F.2d 114 (3d Cir.1991) (ERISA preempts a New Jersey statute that regulates the payment of fringe benefits); *McMahon v. McDowell,* 794 F.2d 100 (3d Cir.1986) (ERISA preempts a Pennsylvania statute that allowed employees to collect unpaid ERISA plan benefits directly from the officers of a company, thus adding to the employee plans another means of collecting benefits), *cert. denied,* 479 U.S. 971, 107 S.Ct. 473, 93 L.Ed.2d 417 (1986).

4. *See, e.g., Mackey v. Lanier Collection Agency and Service, Inc.,* 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988) (a portion of Georgia's garnishment statute "which singles out ERISA plan, by express reference, for special treatment is preempted." *Id.,* at 838, n. 12, 108 S.Ct. at 2190, n. 12; *McCoy v. Massachusetts Institute of Technology,* 950 F.2d 13, 19 (1st Cir.1991) (ERISA preempts a Massachusetts lien statute which "expressly singles out ERISA plans for special treatment."), *cert. denied,* — U.S. —, 112 S.Ct. 1939, 118 L.Ed.2d 545 (1992).

5. *E.g., District of Columbia v. Greater Washington Bd. of Trade,* — U.S. —, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992) (ERISA preempts a District of Columbia statute that required employers who provide health insurance for their employees to provide equivalent health insurance coverage for injured employees eligible for workers' compensation benefits); *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990) (ERISA preempts employee's state law wrongful discharge claim where claim was based on allegation that discharge was motivated by employer's desire to avoid making contributions to employee's pension fund).

6. As the plans correctly point out, the Supreme Court has declared that the phrase "relates to" in

purpose in mind that one must read the myriad of ERISA preemption cases that have been decided in the courts since ERISA was adopted. It informs the following analysis of these cases.

A rule of law relates to an ERISA plan if it is specifically designed to affect employee benefit plans,[3] if it singles out such plans for special treatment,[4] or if the rights or restrictions it creates are predicated on the existence of such a plan.[5] Because we are here dealing with a statute of general applicability that is designed to establish the prices to be paid for hospital services, which does not single out ERISA plans for special treatment, and which functions without regard to the existence of such plans, the cases which have cordoned off this area of preemption are inapplicable.[6]

§ 514(a) is used "in the normal sense of the phrase" and has cited the definition of "Relate" found in Black's Law Dictionary. That definition includes "to refer to" as one accepted meaning. *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 97, n. 16, 103 S.Ct. 2890, 2900, n. 16, 77 L.Ed.2d 490 (1983). Nevertheless, we disagree with the plans' argument that Chapter 83 is preempted simply because it expressly refers to "self-funded union" plans as one example of a "third party payor". Where, as here, a reference to an ERISA plan can be excised without altering the legal effect of a statute in any way, we believe the reference should be regarded as without legal consequence for § 514(a) purposes. Thus, for example, a state statute providing that "no employer, including an ERISA plan, shall discriminate on grounds of race or gender" would not be preempted despite its reference to an ERISA plan. See footnote 11 *infra.*

We also disagree with the dissenting opinion's suggestion that a statute should be preempted solely because the participation of ERISA plans is required as a matter of economics in order for the statute to meet its social goals. This is not what we understand the Supreme Court to have meant in *Greater Washington Board of Trade* when it held that statutes predicated on the existence of ERISA plans "relate to" such plans. The statute in that case could not be applied without reference to the "coverage levels set forth in ERISA plans." As we understand it, it is of no legal consequence if removing ERISA plans from the scene would diminish the likelihood that the statute would meet its social goals. Rather, the test for preemption in this regard is whether the existence of ERISA plans is necessary for the statute to be meaningfully applied. *Greater Washington Board of Trade,* — U.S. at ———, 113 S.Ct. at 583–84.

■ This does not end our inquiry, however. A state rule of law may be preempted even though it has no such direct nexus with ERISA plans if its effect is to dictate or restrict the choices of ERISA plans with regard to their benefits, structure, reporting and administration, or if allowing states to have such rules would impair the ability of a plan to function simultaneously in a number of states.[7]

New Jersey's scheme may increase the charges billed to ERISA plan participants for hospital services. This will mean that any plan which commits to pay all or some lesser percentage of a participant's hospital costs will be called upon to pay more in benefits than it otherwise would. This effect is no different in kind, however, from any state regulation that increases the cost of goods or services that hospitals consume and pass on in hospital costs, i.e., utility costs, the wages of its employees, waste disposal costs, etc. New Jersey's scheme does not direct ERISA plans to structure their benefits or conduct their internal affairs in any particular way. Nor does it deprive ERISA plans of any alternative they would otherwise have in these areas. Finally, since the cost of hospital services will necessarily vary from region to region, we fail to see how state regulation of hospital pricing like that chosen by New Jersey is likely to make interstate operation of an ERISA plan more difficult.

■ Where there is no direct nexus between a state statute and ERISA plans, no effect on the manner of such plans' conducting business or their ability to operate in interstate commerce, statutes have been upheld despite the fact that they may have the indirect ultimate effect of increasing plan costs. In *Mackey v. Lanier Collection Agency and Service, Inc.,* 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988), for example, the court held that Georgia's general statute authorizing garnishment of obligations due debtors could be utilized by creditors of ERISA plan participants to require the application of plan benefits to satisfy participants' personal debts. Georgia garnishment law as so applied was found not to be preempted by § 514(a) despite the fact that "benefit plans subjected to garnishment ... incur substantial administrative burdens and costs" in responding to garnishment summons.

The most helpful case in the present context is *Rebaldo v. Cuomo,* 749 F.2d 133 (2d Cir.1984), where the court sustained against a preemption challenge a New York statute setting the rates that hospitals in that state had to charge patients, including those who were participants in self-insured employee benefit plans. The court, after noting the obvious "fact that ERISA plan members and managers are bound to engage in myriad transactions that Congress never considered when it drafted § 514," made the following observations that seem equally pertinent here:

A preemption provision designed to prevent state interference with federal control of ERISA plans does not require the creation of a fully insulated legal world that

---

7. *See, e.g., FMC Corp. v. Holliday,* 498 U.S. 52, 60, 111 S.Ct. 403, 408, 112 L.Ed.2d 356 (1990) (ERISA preempts a Pennsylvania antisubrogation statute which prevented Pennsylvania plans "from being structured in a manner requiring reimbursement in the event of recovery from a third party"); *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981) (ERISA preempts New Jersey statute insofar as that statute prevents ERISA plans from decreasing benefits by the amount a recipient is awarded in worker's compensation subsequent to retirement); *Hampton Industries Inc. v. Sparrow,* 981 F.2d 726 (4th Cir.1992); (ERISA preempts a North Carolina antisubrogation statute); *National Elevator Industry, Inc. v. Calhoun,* 957 F.2d 1555, 1561 (10th Cir.1992) (ERISA preempts administrative interpretation of Okla-

homa's prevailing wage statute insofar as it determines rates of pay and "may be used to effect change in the administration, structure and benefits of an ERISA plan"), *cert. denied,* —— U.S. ——, 113 S.Ct. 406, 121 L.Ed.2d 331 (1992); *Michigan Carpenters Council v. C.J. Rogers, Inc.,* 933 F.2d 376 (6th Cir.1991) (ERISA preempts Michigan state corporate reorganization statute that allows employers unilaterally to alter their obligation to ERISA plans), *cert. denied,* —— U.S. ——, 112 S.Ct. 585, 116 L.Ed.2d 610 (1991); *Arkansas Blue Cross & Blue Shield v. St. Mary's Hospital,* 947 F.2d 1341 (8th Cir.1991) (ERISA preempts Arkansas statute regulating the assignment of benefits to health care providers), *cert. denied,* —— U.S. ——, 112 S.Ct. 2305, 119 L.Ed.2d 227 (1992).

excludes these plans from regulation of any purely local transaction.

\* \* \* \* \* \*

The purchase of hospital service is like the purchase of public utility service, or of any other service or commodity whose price is controlled by the State. Insofar as the regulation of hospital rates affects a plan's cost of doing business, it also may be analogized to State labor laws that govern working conditions and labor costs, to rent control laws that determine what employee benefit plans pay or receive for rental property, and even to such minor costs as the Thruway, bridge and tunnel tolls that are charged to plans' officers or employees. In short, if ERISA is held to invalidate every State action that may increase the cost of operating employee benefit plans, those plans will be permitted a charmed existence that never was contemplated by Congress. Where, as here, a State statute of general application does not affect the structure, the administration, or the type of benefits provided by an ERISA plan, the mere fact that the statute has some economic impact on the plan does not require that the statute be invalidated.

Moreover, such indirect economic impact as may result from State control over hospital rates does not run counter to ERISA's aim of national uniformity in plan regulation. See Shaw v. Delta Air Lines, Inc., supra, 103 S.Ct. at 2890 n. 20. There is no valid reason why employee benefit plans cannot be subject to nationally uniform supervision despite dissimilarities in their costs of doing business. Indeed, if statutes such as section 2807–a(6)(b) of New York's Public Health Law are held to be preempted by ERISA, every hospital

will be able to set its own rates for ERISA plans, and appellee does not contend that these rates are, or will be, uniform, even as between hospitals in the same locality.

749 F.2d at 138–39.

The plans insist that *Rebaldo* is no longer "good law" in light of the Supreme Court's subsequent decision in *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). While we agree that a portion of the *Rebaldo* court's analysis was rejected in *Ingersoll–Rand*, the above-quoted reasoning remains persuasive and we are confident that *Rebaldo* would have been decided in the same way if the court had had the benefit of the teachings of *Ingersoll–Rand*.[8]

In *Ingersoll–Rand*, the Supreme Court addressed the issue of whether § 514(a) preempts a state cause of action in favor of an employee terminated to prevent the vesting of his or her pension benefits. It was confronted with an argument that the phrase "relate to any employment benefit plan" should be read in the context of § 514 as a whole and that the wording of § 514(c)(2) indicates that § 514 preempts only a state law which "purports to regulate, ... directly or indirectly, the terms and conditions of employee benefits plans." 29 U.S.C. § 1144(c)(2).[9] If § 514(c)(2) did so limit the scope of § 514, the state cause of action at issue would not be preempted because it did not purport to regulate the terms and conditions of ERISA plans. The Supreme Court determined, however, that § 514 preemption was not so limited and that it extended to a state cause of action predicated on the existence of an employee benefit plan. Since one of the elements of the state cause of action

---

8. We thus find ourselves unpersuaded by the Southern District of New York's recent opinion in *Travelers Insurance Co. v. Cuomo*, 813 F.Supp. 996, which suggested that *Rebaldo* has been entirely eroded by opinions of the Supreme Court. The opinion proceeds from what appears to us to be a misconstruction of the Supreme Court's opinion in *FMC Corp. v. Holliday*, 498 U.S. 52, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990). The court in that case seems to understand *FMC* to have been concerned with presenting uniform costs of doing business to plan administrators. By our reading, however, *FMC* was concerned to prevent a state statute from forcing decisions

regarding the internal design and structure of benefit plans (e.g. who may collect, and how, and from whom).

9. Section 514(c)(2) reads in full:

The term "State" includes a State, any political subdivisions thereof, or any agency or instrumentality of either, which purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans covered by this subchapter.

29 U.S.C. § 1144(c)(2).

was the existence of such a plan, the Supreme Court had "no difficulty in concluding" that it was preempted. *Id.* at 140, 111 S.Ct. at 483. It explained,

> ... We are not dealing here with a generally applicable statute that makes no reference to, or indeed functions irrespective of, the existence of an ERISA plan. Nor is the cost of defending this lawsuit a mere administrative burden. Here, the existence of a pension plan is a critical factor in establishing liability under the State's wrongful discharge law. As a result, this cause of action relates not merely to pension benefits, but to the essence of the pension *plan* itself.

While the court in *Rebaldo* did suggest that § 514(c)(2) could be read to limit the scope of § 514 preemption,[10] this was not the touchstone of its analysis. Unlike the court in *Ingersoll–Rand*, the *Rebaldo* court *was* "dealing ... with a generally applicable statute that makes no reference to, [and] functions irrespective of, the existence of an ERISA plan," *Id.* at 139, 111 S.Ct. at 483, and that affects such plans only by increasing their costs of doing business. As the above-quoted portions of the opinion bear witness, it was the absence of a direct nexus to ERISA plans and the limited nature of the statute's impact on such plans that put the pricing regulation in *Rebaldo* beyond the scope of § 514 preemption.[11]

In summary, we, too, have before us a generally applicable law which (1) is not intended to regulate the affairs of ERISA plans, (2) neither singles out such plans for special treatment nor predicates rights or obligations on the existence of an ERISA plan, and (3) does not have either the effect of dictating or restricting the manner in which ERISA plans structure or conduct their affairs or the effect of impairing their ability to operate simultaneously in more than one state. We have found no case that has held such a law to be preempted by § 514(a), and we decline to so hold.

As we analyze the issue before us, we are not troubled, as was the district court, by what the plans refer to as the cost shifting aspects of New Jersey's program. The district court accepted the plans' argument that New Jersey was requiring them to act in a manner inconsistent with their obligation under ERISA to apply fund assets only for the benefit of fund participants. Were this the case, New Jersey's statute would, of course, be preempted as applied to the plans. But plaintiffs purport to understand ERISA to impose upon them a burden which would be an intolerable one and which we are confident Congress never intended ERISA plans to bear.

■ The plans argue that their fiduciary duty to apply fund assets only for the benefit of fund beneficiaries forbids them from paying for hospital services received by those beneficiaries if any portion of the price paid can be viewed as attributable to the cost of providing services to others, such as indigent and Medicare patients. As the plans appear to us to concede, however, it would be impossible to have a requirement that ERISA plans must "look through" to the pricing structure of every health care provider to assure that the price of the services rendered a particular patient directly correlates with

10. The infirmity of this portion of the *Rebaldo* opinion is noted by the Court of Appeals for the Second Circuit in *Smith v. Dunham–Bush, Inc.,* 959 F.2d 6, 9 n. 3 (2d Cir.1992).

11. The reasoning of the court in *Rebaldo* parallels that in *Lane v. Goren,* 743 F.2d 1337 (9th Cir.1984) which held that the application of California's anti-discrimination laws to the employment practices of an ERISA plan's trustees is not preempted by ERISA. The court so held because the California law affected the trustees only in their "capacity as an employer, and in a way that all other employers were affected," *Id.* at 1340,

because the only effect was to increase the trustee's costs of doing business. The court noted:
> That argument does not withstand scrutiny. So too, for example, do state law and municipal ordinances regulating zoning, health, and safety increase the operational costs of ERISA trusts, but no one could seriously argue that they are preempted.

*See, also, Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 97 n. 17, 103 S.Ct. 2890, 2900 n. 17, 103 S.Ct. 2890, 2900 n. 17, 77 L.Ed.2d 490 (1983) (New York's anti-discrimination law as applied to ERISA plans is not preempted "insofar as it prohibits employment discrimination in hiring, promotion, salary, and the like").

the costs of those services. We think an ERISA plan meets its ERISA responsibilities when it pays whatever portion of the price charged by the health care provider the plan has assumed.

First, the plans do not challenge the base DRG rate feature of New Jersey's price control program even though it is inherent in this approach that a patient having an appendectomy who winds up in intensive care for two weeks pays the same amount as another patient who has an appendectomy and leaves the hospital the following day. The plans do not challenge this aspect of the plan because they acknowledge that it is not feasible in any real sense to isolate the costs attributable to any particular patient. The plans understandably add that if they have enough appendectomy patients over the years the costs they pay on behalf of others theoretically will be offset by the costs other pay on behalf of plan participants. It nevertheless remains true that the portions of the New Jersey scheme unchallenged by the plans recognize the prohibitive transactions costs associated with matching any particular disbursement of fund assets to cover a hospital bill with the actual costs of treating that particular patient.

More importantly, there are many forms of state regulation under the police power which result in increases in the cost of doing business and corresponding increases in prices where the beneficiaries of the regulation are not those who are paying the increased prices. States have recently begun to regulate the disposal of medical wastes, for example, in order to protect those who otherwise would be adversely affected by socially irresponsible disposal. Such regulations can significantly increase a hospital's cost of doing business and, accordingly, its billings to plan participants. We are confident, however, that ERISA was not intended to foreclose a state regulation of this kind. New Jersey's decisions to require hospitals to treat indigents and to treat Medicare patients for the Medicare reimbursement seem

to us to be similar exercises of its police power.

In short, we are unwilling to attribute to Congress and § 514 an intent to frustrate the efforts of a state, under its police power, to regulate health care costs. In particular, we are unwilling to infer from ERISA's prohibition against applying fund assets for the benefit of others a Congressional intent to foreclose health care cost regulation of the kind here challenged.

## V.

Having concluded that the challenged portions of Chapter 83 are not preempted by § 514(a) and are not unconstitutional, we will reverse the judgment of the district court, vacate the injunction, and remand with instructions that judgment be entered for the defendants.[12]

NYGAARD, Circuit Judge, dissenting.

This is a close case because it tests the outer limits of ERISA preemption. Although my decision is made more difficult because the New Jersey regulatory scheme (the "Act") is admirable for its intended purpose and goals, I think Congress intended to preempt these kinds of statutes. The issue is whether a statute of purported general applicability "relates to," in the ordinary and broad sense of that term, ERISA plans if it disproportionately impacts upon ERISA plans, presupposes the existence of ERISA plans, and depends on funds extracted from ERISA plans to implement its legislative mandate. Because I believe that the district court correctly concluded that such a statute is preempted, see *United Wire, Metal & Machine Health and Welfare Fund v. Morristown Memorial Hosp.*, 793 F.Supp. 524, 531–37 (D.N.J.1992), I respectfully dissent.

## I.

Congress enacted ERISA to subject employee benefit plans to a uniform system of federal laws governing disclosure, reporting,

---

**12.** It appears that there are plaintiff plans which have not asserted a claim for restitution. As to any such plaintiff, the passage of the new statute rendered its case moot. The district court should dismiss the claims of any such plaintiffs before entering judgment for the defendants on the remaining claims.

standards of conduct, remedies, sanctions, and access to federal courts. Since uniformity cannot be achieved if ERISA plans are subject to varying state regulations, Congress preempted "any and all State laws insofar as they ... *relate to* any employee benefit plans." ERISA § 514(a), 29 U.S.C. § 1144(a) (emphasis added).

Section 514(a) is deliberately expansive and "conspicuous for its breadth." *FMC Corp. v. Holliday*, 498 U.S. 52, 58, 111 S.Ct. 403, 407, 112 L.Ed.2d 356 (1990). It is "virtually unique" among federal preemption statutes, *Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 24 n. 26, 103 S.Ct. 2841, 2854 n. 26, 77 L.Ed.2d 420 (1983), as it is "one of the broadest preemption clauses ever enacted by Congress." *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1439 (9th Cir.1990).

The term "relate to" must be given a "broad common-sense meaning." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47, 107 S.Ct. 1549, 1553, 95 L.Ed.2d 39 (1987). A state law relates to an ERISA plan "in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983). Any connection may trigger preemption, and preemption is not limited to laws relating to the specific subjects covered by ERISA. *Pilot Life*, 481 U.S. at 47–48, 107 S.Ct. at 1553; *Shaw*, 463 U.S. at 97, 103 S.Ct. at 2900. That a state law may be "consistent with ERISA's substantive requirements" or was enacted to "effectuate ERISA's underlying purposes" does not save it from preemption. *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739, 105 S.Ct. 2380, 2388–89, 85 L.Ed.2d 728 (1985); *Mackey v. Lanier Collection Agency & Serv.*, 486 U.S. 825, 829, 108 S.Ct. 2182, 2185, 100 L.Ed.2d 836 (1988). A state law may relate to a benefit plan even if it is not specifically designed to affect such plan or its effect is only indirect. *Pilot Life*, 481 U.S. at 47, 107 S.Ct. at 1552–53; *Shaw*, 463 U.S. at 97, 103 S.Ct. at 2900; *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 524–25, 101 S.Ct. 1895, 1907, 68 L.Ed.2d 402 (1981); *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 139, 111 S.Ct. 478, 483, 112 L.Ed.2d 474 (1990).

Since no law exists in a vacuum and arguably many laws could be held to "relate to" ERISA plans, without some limits Section 514(a) could become a legal blackhole with an attractive force no state law could resist. Hence, some laws are said to affect ERISA plans in "too tenuous, remote, or peripheral a manner to warrant a finding that [they] 'relate to' the plan." *Shaw*, 463 U.S. at 100 n. 21, 103 S.Ct. at 2901 n. 21. See, e.g., *Mackey*, 486 U.S. at 840–41, 108 S.Ct. at 2191 (garnishment statute of general applicability is not preempted). The task then is to determine the precise relationship between the Act and ERISA plans. *Mackey*, 486 U.S. at 830, 108 S.Ct. at 2186.

## II.

The declared public policy of the Act is to "contain the rising costs of health care services, and to ensure the financial solvency of hospitals." N.J.S.A. § 26:2H–1. The linchpin in this scheme is the DRG rate, which is a statistical average of costs incurred by hospitals to perform a particular medical procedure. The DRG is the rate hospitals must bill for particular services. Thus, it functions as both a price cap and an incentive to reduce costs.

The plans do not challenge the validity of the DRG rate scheme, but only attack three surcharge components incorporated into the DRG. They are costs for uncompensated care and bad debts, Medicare cost shifts, and costs related to discounts given to certain payer groups. Only hospital patients, not the general public, pay these costs. The New Jersey scheme is, quite simply, a cost-shifting mechanism whereby those who do not have deep pockets or are favored by the law are given discounts or free services. Since these discounts and services cause state-mandated financial losses to hospitals, the Act remunerates hospitals by shifting these losses through the DRG, resulting in additional 19.7% and 7% surcharges in uncompensated and Medicare cost shifts to those with deep pockets—commercial insurers and ERISA plans.

ERISA plans play such a critical role in this scheme that without them it would fall apart. They comprise a major segment of the paying hospital service users who subsidize those favored by the Act. The structure of the scheme indicates in not-so-subtle ways that the New Jersey legislature was well aware of the pivotal role ERISA plans would play in its scheme. Upon pain of not receiving reimbursements for their uncompensated care costs, the Act requires hospitals to screen patients to determine whether they are covered by a commercial insurer or a "union welfare plan." N.J.S.A. § 26:2H–18.-31(c)(2). Also, under the appeal policy existing at the time, while individual patients as well as third-party payors could have appealed mistakes in the assignment of a particular DRG, only individual patients could have appealed an assignment of a DRG that was technically correct but may have been excessive. The third-party payer (commercial insurer, *self-funded union*, etc.) was specifically excluded from appealing a correct but excessive charge. A vast majority of appeals, about 85%, were based on excessive charges, and only about 1% of them were denied. Thus, the goal is transparent and little explanation is needed to see what this appeal process was designed to do.

In October 1990, the New Jersey Governor's Commission on Health Care Cost submitted a report that plainly concluded: "Only a portion of New Jersey businesses, those who purchase insurance for their workers, pay the lion's share of caring for the uninsured." It summarized the impact on employee benefit plans: "It was apparent that rapidly rising health insurance costs were a significant burden to both the business community and the labor force in this State with the potential to negatively affect New Jersey citizens, ... [and] that the Uncompensated Care Trust Fund while affording access to hospital services was unfairly financed on the backs of those who had health insurance...."

Last, the State concedes that the scheme is not "viable" without money from the plans as they "represent a major segment of the bill-paying public, to the point that it is *impossible* to devise a viable hospital rate-setting scheme if that segment is excluded or exempted from the scheme." Br. 2 (emphasis added). This concession dispels any doubt that the effect of the Act is to reach into the deep pockets of ERISA funds.

The Act provides a conduit by which money is transferred from, among others, ERISA plans to hospitals. Rather than spend its own general funds, New Jersey implemented a money transfer scheme where ERISA plans subsidize the medical bills of those who are favored by law. One affidavit accurately concluded: "Indeed, if the State of New Jersey were to assume the uncompensated care and the Medicare cost shift as social obligations from its general revenues, for example, the average hospital bill would decrease on a pro rata basis by this amount and these shifts would no longer be reflected in New Jersey hospital bills."

### III.

The majority believes that the connection between the Act and ERISA plans is too tenuous and remote "[b]ecause we are here dealing with a statute of general applicability that is designed to establish the prices to be paid for hospital services, which does not single out ERISA plans for special treatment, and which functions without regard to the existence of such plans...." Majority at 1192. The majority relies in part on *Mackey v. Lanier Collection Agency & Serv.*, 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988), to suggest that where there is no direct nexus, or where a statute does not directly affect the administration of ERISA plans, the statute is not preempted despite any "indirect ultimate effect of increasing plan costs." Majority at 1193–94.

In *Mackey* the issue was whether a generally applicable Georgia garnishment statute was preempted by ERISA. The Court first recognized that a statute need not specifically single out, mention, or have a direct nexus to ERISA plans to be preempted. 486 U.S. at 831, 108 S.Ct. at 2186, citing *Pilot Life*, 481 U.S. at 46–47, 107 S.Ct. at 1552–53, and *Shaw*, 463 U.S. at 97, 103 S.Ct. at 2900. The Court held, however, that the statute was not preempted. In light of certain ERISA provisions, one of which provides that a plan may "sue or be sued" as an entity, 29 U.S.C.

§ 1132(d)(1), the Court reasoned that money judgments against ERISA plans must be collectable in some way and that garnishment is one permissible method. 486 U.S. at 834 & n. 9, 108 S.Ct. at 2188 & n. 9, citing *FHA v. Burr*, 309 U.S. 242, 246–47, 60 S.Ct. 488, 491, 84 L.Ed. 724 (1940) (where Congress provides that an entity may "sue or be sued," all civil processes incident to legal proceedings including "garnishment and attachment" may apply). Thus, *Mackey* does not stand for the proposition that a generally applicable statute should not be preempted even though it may result in some "indirect economic impact." It stands for the proposition that where *Congress intended* for state law to apply to ERISA, that law will not be preempted even though it may otherwise relate to ERISA plans by placing indirect financial or administrative burdens on them.[1]

The majority nowhere shows how any provision in or the structure of ERISA suggests that Congress did not intend these kinds of statutes to be preempted. See *Malone v. White Motor Corp.*, 435 U.S. 497, 504, 98 S.Ct. 1185, 1190, 55 L.Ed.2d 443 (1978) ("purpose of Congress is the ultimate touchstone"). Where Congress adopts a broad preemption provision, the "task of discerning congressional intent is considerably simplified." *Ingersoll–Rand*, 498 U.S. at 138, 111 S.Ct. at 482.

Although any connection may suffice, the task is made easier when the statute refers to or specially singles out ERISA plans. The Act requires hospitals to ask patients whether they belong to a "union welfare plan," and it expressly excludes "self-funded union" plans from appealing hospital bills. The majority, however, brushes these references aside by concluding that they "can be excised without altering the effect of [the] statute in any way," and therefore they "should be regarded as without legal consequence for § 514(a) purposes." Majority at 1192 n. 6.

The majority underestimates the significance of these references. New Jersey has implicitly classified all hospital users into two groups: those who are able to pay and those who are not. This simple dichotomy then determines "whether the patient is eligible for participation in a public assistance program," N.J.S.A. § 26:2H–18.31(c)(3), whether one must pay the three surcharges, and whether and what one may appeal. A large segment of the small percentage of patients who are able to fully pay for medical services are plan beneficiaries, and hence New Jersey requires hospitals to ask whether a patient belongs to a "union welfare plan." Thus, the conclusion that the references to ERISA plans in the Act "can be excised without altering the effect of [the] statute in any way" is without support.

Even assuming, *arguendo*, that the Act does not *expressly single out* ERISA plans for special treatment, it does so *as applied*. One cannot ignore the practical consequences produced by this statute, a consequence that according to the report commissioned by the State resulted in ERISA plans having paid "the lion's share of caring for the uninsured." See *Mackey*, 486 U.S. at 829, 108 S.Ct. at 2185 (it is "virtually taken ... for granted that state laws which are 'specifically designed to affect employee benefit plans' are pre-empted under § 514(a)").

Moreover, the assumption that the Act "functions without regard to the existence of such plans" is puzzling in light of the State's concession that the Act is not "viable" without ERISA plans. The Act was designed with ERISA funds in mind. In this sense, it has been eminently successful; the financial drain on ERISA funds has been enormous. The surcharges are paid not by the general public at large, but by the less than 25% of the population who use hospital services. Of those 25%, about 75% receive the uncompensated care assessments challenged here. ERISA plan participants comprise only

---

**1.** Without the congressional intent derived specifically from the structure of ERISA, *Mackey* would probably have been decided differently. Both the majority and the dissent in *Mackey* observed that the garnishment law subjected the plans to "substantial" and "significant administrative burdens and costs." See 486 U.S. at 831, 842, 108 S.Ct. at 2186, 2192. Because "plans face the repetitious and costly burden of monitoring controversies involving hundreds of beneficiaries and participants in various States," *Id.* at 844, 108 S.Ct. at 2193, Justices Kennedy, Blackmun, O'Conner, and Scalia dissented.

about 15% of the hospital patients, but pay about 40% of the more than $1.1 billion shortfall generated by the state-mandated cost shifts.

In *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990), an employee sued in Texas state court, alleging that he was fired because his employer did not want to contribute to his pension fund. He sought damages under various tort and contract theories, but did not plead an ERISA cause of action. The Texas Supreme Court recognized a cause of action for wrongful discharge based upon "the employer's desire to avoid contributing to or paying benefits under the employee's pension fund." The Supreme Court reversed and held that the cause of action was preempted because it was premised on the existence of a pension plan. It reasoned that "to prevail, a plaintiff must plead, and the court must find, that an ERISA plan exists and the employer had a pension-defeating motive in terminating the employment. Because the court's inquiry must be directed to the plan, this judicially created cause of action 'relates to' an ERISA plan." *Id.* at 140, 111 S.Ct. at 483.

Similar to the Texas cause of action, the New Jersey statute is predicated on the existence of ERISA plans and its mandates cannot be carried out without ERISA funds. See *id.* at 140, 111 S.Ct. at 484 ("there simply is *no* cause of action if there is no plan") (emphasis in original). Also, the costs associated with the New Jersey regulatory scheme are not qualitatively the same as those in either *Mackey* or *Ingersoll–Rand*. In *Mackey,* the four dissenting Justices opined that the administrative burdens of allowing ERISA benefits to be garnished were so "significant" as to warrant preemption of a generally applicable garnishment statute. 486 U.S. at 842, 108 S.Ct. at 2192. In *Ingersoll–Rand,* a unanimous Supreme Court noted that the litigation costs of defending against a cause of action predicated upon the existence of an ERISA plan were substantial. 498 U.S. at 139–40, 111 S.Ct. at 483. No one will dispute that these costs pale in comparison to the hundreds of millions of dollars extracted from ERISA funds under the Act.

And while the majority may classify these costs as "the limited nature of the statute's impact on such plans," I do not.

One may argue that nothing in the Act establishes the level of benefits or structures plan benefits to include these shifted costs and that each plan is free to cover all, some or none of these costs. This argument is unpersuasive. In *General Elec. Co. v. New York Dep't of Labor,* 891 F.2d 25 (2d Cir. 1989), a New York labor law of general application provided that wages and "supplements" (nonwage benefits which included ERISA plans) on a public works contract must at least equal the prevailing rate and benefits paid in the locality. Where the cost of a benefit provided by an ex-locality contractor did not match those of a similar prevailing local benefit, the statute required the contractor either to bring the benefit into conformity with the local benefit, or to make up the difference through cash payments to its employees. Nothing in the statute, however, required a contractor to alter the benefits to match those in the locality, and the contractor was free to pay cash instead. But the Court of Appeals for the Second Circuit held that ERISA preempted the labor law. It reasoned that the law clearly related to ERISA plans in that to conform to the statute contractors had to maintain "schedules of supplements and wages and to make its books and records pertaining to wages, supplements and hours of labor available for inspection." *Id.* at 29–30.

The Act is analogous to the New York labor statute because it requires ERISA plans either to pay the surcharges or to restructure their benefits to avoid them. Since no one likes to pay for benefits or services one did not receive or benefit from, it is reasonable to expect that some plans may change their terms to exclude these costs, just as it was reasonable to expect that some New York contractors would restructure ERISA plans instead of paying cash benefits. Implicit, then, is the assumption that an ERISA plan, if it does not want to pay for the direct cost of services provided to nonbeneficiaries, "structures all its benefit payments in accordance with New Jersey [hospital rates], or adopts different payment

formulae for employees inside and outside of the State." See *Fort Halifax,* 482 U.S. at 10, 107 S.Ct. at 2217; *Alessi,* 451 U.S. at 523–25, 101 S.Ct. at 1907. This is the precise reason why Congress enacted such a broad preemption provision: so that employee benefit plans would not be subject to the vagaries of state regulations. *Ingersoll–Rand,* 498 U.S. at 141–42, 111 S.Ct. at 484; *Fort Halifax,* 482 U.S. at 10–11, 107 S.Ct. at 2217.

Because New Jersey has asked ERISA plans to carry the brunt of the burden of keeping hospitals financially afloat and, in fact, to largely subsidize its venture into hospital price regulation, and because the State admits that result before this court, I agree with the district court's conclusion that there is a definite, palpable connection between the Act and the plan. See *United Wire,* 793 F.Supp. at 531–37.

## IV.

Much attention in this appeal has been focused on *Rebaldo v. Cuomo,* 749 F.2d 133 (2d Cir.1984). The New York statute provided that the state must establish for each hospital an "inpatient revenue cap," which was a price cap with additional allowances made for bad debts and charity care. The statute allowed certain programs, like Blue Cross, to get discounts, but certain ERISA plans did not qualify. The Court of Appeals for the Second Circuit first reasoned that because Section 514(c)(2) defines "State" as any agency, instrumentality or political subdivision that "purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans," 29 U.S.C. § 1144(c)(2), this restriction modified Section 514(a)'s broad preemption provision. 749 F.2d at 137. The court held that where "a State statute of general application does not affect the structure, the administration, or the type of benefits provided by an ERISA plan, the mere fact that the statute has some economic impact on the plan does not require that the statute be invalidated." *Id.* at 139. This holding is now infirm as the Supreme Court has since rejected the view that the definition of "State" restricts the scope of Section 514(a). *Ingersoll–Rand,* 498 U.S. at 141–42, 111 S.Ct. at 484.[2]

The *Rebaldo* court justified its holding with an economic/policy argument. It reasoned that the regulation of hospital rates are analogous to any state regulations that increase the cost of doing business for hospitals. 749 F.2d at 138. Thus, for example, the court opined that ERISA plans could not contend that they are exempt from price increases as a result of increased labor, utility, or rent costs, or from such minor costs as the bridge and tunnel tolls that are charged to plan officers or employees. *Id.* Moreover, it opined that since ERISA plans can be subject to nationally uniform supervision despite dissimilarities in hospital prices, any "indirect economic impact" would be consistent with ERISA's aim of national uniformity in plan regulation. *Id.* at 139.

Recently, even this economic rationale, for whatever worth it had, has been eroded. Although the *Rebaldo* court suggested that "State labor laws that govern working conditions and labor costs ... that [have] some economic impact on the plan" would not be preempted, *id.* at 138–39, the Court of Appeals for the Second Circuit has since retreated from this position and has preempted a generally applicable statute governing labor costs that imposed upon ERISA plans indirect financial and administrative burdens. *General Electric,* 891 F.2d at 29–30.[3]

2. Although the majority recognizes that *Ingersoll–Rand* overruled *Rebaldo,* at least in part, it distinguishes *Ingersoll–Rand* on the basis that the *Rebaldo* court dealt with "a generally applicable statute that makes no reference to, [and] functions irrespective of, the existence of an ERISA plan." Majority at 1194 (quoting *Ingersoll–Rand,* 498 U.S. at 139, 111 S.Ct. at 483). Of course, that is the question here.

3. Indeed, although Judge Van Graafeiland authored both *Rebaldo* and *General Electric,* the dissent in *General Electric* considered *Rebaldo* controlling:

The majority does not attempt to distinguish *Rebaldo* and *Aetna Life [Ins. Co. v. Borges,* 869 F.2d 142] nor, in my view, could it sensibly do so. Like the statutes we upheld in those decisions, New York's prevailing wage statute is a law of general application whose tangential effects on employee benefits plans are negligible and wholly incidental to the law's primary purpose.

Despite the Supreme Court's rejection of the holding in *Rebaldo* and the Court of Appeals for the Second Circuit's implicit rejection of its rationale, the majority nonetheless relies heavily on it. Faced with Section 514(a)'s sweeping preemption provision and the cause-and-effect financial connection between the Act and ERISA funds, the majority justifies its decision by reasoning that the Act is analogous to any number of state laws that may indirectly increase the cost of doing business, such as regulations governing labor, utility or rent costs. Majority at 1193. It suggests as an example that regulations concerning the disposal of medical waste would not be preempted though their implementation may net higher medical bills as a result of the increased cost of doing business. *Id.* at 1195.

I agree with the majority insofar as ERISA plans do not lead a "charmed existence." *Rebaldo*, 749 F.2d at 139. They are, of course, not exempt from paying rent, tolls, or even the many overhead costs associated with hospital management. The DRG takes into account both direct costs, such as hospital employees' salaries and benefits, and indirect costs, such as institutional overhead expenses for management, research, education and maintenance. The plans, however, do not argue that the *entire* DRG system is incompatible with ERISA; they do not argue that they must only pay the "actual costs" for medical services; they do not argue that any laws that increase the cost of doing business for hospitals do not apply to them; nor do they argue that they are entitled to pay to the penny only their pro rata share of overhead and incidental costs. They argue instead that the three surcharges differ from ordinary overhead costs in two important ways: first, plan participants derive no benefit from these surcharges; second, these surcharges are not equitably distributed to the general population, or to the State, or to even hospital users, but are placed squarely on the shoulders of commercial insurers and ERISA plans. As a result, they contend that they are forced to subsidize nonparticipant patients with ERISA funds.

The majority largely ignores these distinctions, choosing instead to sweep all state-mandated costs under the general penumbra of "overhead" costs. When states regulate, for example, utility, labor, education or medical sanitation, they increase the cost of doing business. To remain solvent and be able to provide services, businesses must be able to incorporate these increases into these prices. In a market-based system, each consumer will pay for costs attributable to running the business, so overhead is part of the indirect costs associated with the purchase of goods and services. Since it is administratively impossible to isolate the precise actual costs attributable to any particular patient, many of the direct and indirect costs incorporated into the DRG such as overhead for management and maintenance are proper. The plans do not contend otherwise.

The surcharges are a different story, however. They are not indirect costs associated with *any* hospital services to plan beneficiaries. They are the direct cost of hospital services rendered to *other patients,* which have then been shifted to ERISA plans. One can argue, as the appellants do, that even businesses incorporate losses involved in stolen merchandises and bad debts into their prices. But the issue is not whether ERISA protects plans from the imposition of these kinds of costs because ERISA preempts only "state law" and not private action, or whether ERISA plans are entitled to nationally uniform hospital prices because that is impossible. The issue is whether state regulations have interfered with the operation of ERISA plans to the point where the plans have suffered large financial losses.

The argument that plans are affected the same way without regulations is based on questionable applications of economic assumptions. In a free market system, as well as most regulated systems, no business would knowingly sell to one who cannot in

891 F.2d at 31.

The rejection of *Rebaldo* is understandable. It is not so much attributable to inconsistent decisionmaking as to the court's recognition that ERISA preemption is as broad as the statute would suggest. The Court of Appeals for the Second Circuit decided *Rebaldo* in 1984, without the benefit of, among other cases, *Holliday, Pilot Life, Metropolitan Life, Mackey,* and *Ingersoll–Rand.*

full or in part pay, whereas here New Jersey requires hospitals to provide services regardless of one's ability to pay and then places the losses squarely on a small class of patients. Without the Act, the financial calculus and its effects on ERISA funds would change drastically. Since each hospital will have different rates depending in part upon their total losses, with urban hospitals, for example, incurring more losses from indigent care and bad debts, the plans would be free to select hospitals with the lowest prices. And even if hospitals distribute their losses by overcharging ERISA plans, the plans would have an alternative: they would normally be free to negotiate with various hospitals for group rates just as some groups under the Act are able to negotiate lower rates (the difference of which ERISA funds have been forced to defray). Under the Act, however, the plans are in effect precluded from negotiating group rates because, as the State concedes, the Act takes away any incentive to negotiate when it prohibits hospitals from passing on to other patients any revenue shortfall caused by a digression from the DRG rates. But see Majority typescript at 29–30 ("Nor does [the Act] deprive ERISA plans of any alternative they would otherwise have in these areas.").

Moreover, in both market-based and regulated systems, businesses generally pass losses to *all* customers. Here, the object of the Act is to pass hospital losses inequitably to a small segment of hospital consumers. The surcharges are neither paid by the State nor the public at large; they are not even paid by all hospital users. The State created these surcharges with the specific intention that, in essence, only a small group of the hospital users—a large majority of whom comprise ERISA beneficiaries—would pay for them. While the plans do not derive *any* benefit, real or abstract, from the surcharges, the Act takes a substantial chunk of money belonging to ERISA beneficiaries, and all because New Jersey does not want to expend its general funds to pay for the health care costs of others who are less fortunate. As one affidavit summarized: "In effect, New Jersey requires the hospitals to give the service but will pay for it using other people's money, i.e., other users of the hospitals rather than a broader base revenue source such as general taxation."

Thus, the surcharges here are anything but "ordinary" overhead costs that indirectly increase the cost of doing business, and the argument that the Act simply sets prices does not sufficiently credit the direct financial impact on ERISA plans. The majority is correct insofar as states may regulate, for example, the disposal of medical waste and allow hospitals to pass these costs off to patients; but if states require hospitals to pass off these costs only or largely to "commercial insurers and self-funded union plans," such regulations must be preempted.

### V.

I fear that the majority gives States free reign to spend and experiment with ERISA funds, held in trust for the many workers who have labored long for their security, in the noble pursuit of health care reforms so long as States exercise a minimum degree of imagination by couching their statutes in "generally applicable" terms. When I consider the financial impact and other causal effect on ERISA funds in a common sense manner, the connection between ERISA plans and the Act is not too tenuous, remote or peripheral at all. The Act refers specifically to ERISA plans, divests enormous sums of money from ERISA plans, and is predicated on the existence of ERISA plans. In my opinion the Act "relates to" ERISA plans when that term is construed in its ordinary and broad meaning, and I dissent.