NYS HEALTH MAINTENANCE ORGANIZATION CONFERENCE; Capital Areas Community Health Plan, Inc. Cap; Capital District Physicians Health Plan; Choicecare Long Island, Inc. Health Care Plan, Inc.; Health Services Medical Corporation of Central New York, Inc.; Independent Health Association, Inc.; Mid–Hudson Health Plan; Mohawk Valley Physicians Health Plan, Inc.; Oxford Health Plan; Patients' Choice Inc.; Physicians Health Services; Preferred Care, Inc.; Wellcare of New York, Inc.; Leaktex, Inc., doing business as Greentex Company; Miller Printing & Litho, Inc.; U.S. Healthcare, Inc., Plaintiffs–Appellees,

v.

Salvatore R. CURIALE, in his official capacity as Superintendent of Insurance of the State of New York, Defendant–Appellant,

New York State Conference of Blue Cross & Blue Shield Plans, Intervenor–Appellant.

Nos. 2297, 2861, Dockets 94–7435, 94–7441.

United States Court of Appeals, Second Circuit.

Argued Aug. 10, 1994.

Decided Aug. 30, 1995.

Harold N. Iselin, Albany, NY (Couch, White, Brenner, Howard & Feigenbaum, Albany, NY, of counsel) for plaintiffs-appellees.

Alan J. Davis, Philadelphia, PA (Ballard, Spahr, Andrews & Ingersoll, Philadelphia, PA, of counsel), for plaintiff-appellee U.S. Healthcare, Inc..

Eileen M. Considine, Albany, NY (Hinman, Straub, Pigors & Manning, Albany, NY, of counsel), for intervenor-appellant.

Jennifer S. Brand, New York City (Attorney General's Office, New York, of counsel), for defendant-appellant.

Judith D. Heimlich, Washington, DC (U.S. Department of Labor, Washington, DC, of counsel), for movant.

Before: WINTER and LEVAL, Circuit Judges, and BURNS, District Judge.

ELLEN B. BURNS, District Judge:

Defendant–Appellant Salvatore B. Curiale, in his official capacity as the Superintendent of Insurance for the State of New York ("the State"), and intervenor-defendant New York Conference of Blue Cross & Blue Shield Plans ("the Blues") appeal from a judgment of the Southern District of New York (Mukasey, J.) granting summary judgment in favor of plaintiff-appellees, NYS Health Maintenance Organization Conference ("HMOs"). *NYS Health v. Curiale*, Nos. 93 Civ. 1298 & 93 Civ. 1487 (S.D.N.Y. Mar. 30, 1994). Appellants claim that the District Court erred when it enjoined the State from enforcing Regulation 146, 11 N.Y.C.R.R. § 361.1 (1992) ("Regulation 146"), on the ground that Regulation 146 is preempted by the Employee Retirement Income Security Act of 1974, 88 Stat. 829, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"). Because we find that Regulation 146 is not preempted by ERISA, we vacate the District Court's decision and remand for further findings.

## BACKGROUND

The New York State Legislature enacted Chapter 501 of the Laws of 1992 in response to the state's growing health insurance problems. According to the Governor's Approval Memorandum, Chapter 501's overall purpose is to "provide [New York's] residents with a health insurance system in which all who apply must be accepted and offered a rate that cannot vary because of their age, sex, occupation or medical condition." Joint App. 353. Another purpose—perhaps more immediate—is to rescue the failing non-profit insurance organizations, particularly Empire Blue Cross and Blue Shield, from financial failure by stabilizing the insurance market.[1]

---

1. The Blues' reserves, from which reimbursements are paid, were well below State require-

The non-profits' financial disintegration is due, in part, to commercial insurers' use of experience rating to price insurance premiums,[2] rather than open enrollment and community rating, the method utilized by the Blues.[3] Although HMOs also community rate, they fail to attract—or devise to avoid[4]—poorer insurance risks such as the very old and the very sick. Consequently, non-profit insurers, such as the Blues, tend to insure the sickest members of the population without the benefit of a healthy subscribers' pool to offset costs.

Appellants argue that the cure for this discrepancy (and ultimately the Blues' financial predicament) is found in the combined effects of §§ 4317 and 3233 (§§ 14 and 6 of Chapter 501). Under § 4317, all insurers doing business in New York's individual and small group markets, including HMOs,[5] must engage in open enrollment and community rating.[6] Presumably, with the field so leveled, individuals and small groups with higher risk factors—those who otherwise would be insured only by non-profit carriers—will choose to enroll for coverage with commercial insurers and HMOs, thereby reducing the financial strain on the Blues.

Likewise, § 3233 is intended to stabilize the insurance market, particularly upon the impact of § 4317, by reallocating resources and risks among insurers.[7] Specifically,

---

ments and were expected to fall to zero by mid–1992. (Appellees' Brief at 7). Although the State had granted them a 14.2% rate hike earlier, the Blues announced that unless new rules governing the insurance industry were passed immediately, the company would be forced to request an additional 14% hike or face financial failure.

**2.** Experience rating is a "system of insurance pricing that establishes each period's premium level based on the group's claims experience for the prior period." Bryan Ford, *Essay: The Uncertain Case for Market Pricing of Health Insurance*, 74 B.U.L.Rev. 109, 122 n. 58 (1994). By experience rating, commercial insurers can offer lower premiums because "the pool of employees, which exclude[s] the very old and those unable to work, tend[s] to be healthier than the population of the entire community." *Id.* at 122.

**3.** Open enrollment means that an insurer accepts every person who applies for coverage "without regard to age, sex, health status or occupation." N.Y.Ins.Law § 4317(a). Community rating is a "rating methodology in which the premium for all persons covered by a policy or contract form is the same...." *Id.* When an insurer open enrolls and community rates, its premiums necessarily reflect the higher cost of insuring the larger community.

**4.** Appellants claim that the HMOs practice risk discrimination by screening applicants using age, sex and occupation criteria. Appellees deny such screening; although they admit that their subscribers are, on average, younger than those of the Blues, appellees argue that older people are less comfortable with the HMOs' procedures and therefore are less likely to subscribe to HMO plans. Appellees do not address appellants' accusations regarding sex and occupation discrimination.

**5.** Section 4317 specifically applies to HMOs through N.Y.Ins.Law § 1109(a).

An organization complying with the provisions of article forty-four [HMOs] of the [public health law] may operate without being licensed under this chapter and without being subject to any provisions of this chapter, except (1) to the extent that such organization must comply with ... (2) the provisions of section[] ... [4317] of this chapter.
N.Y.Ins.Law § 1109(a).

**6.** No individual health insurance contract and no group health insurance contract covering between three and fifty employees or members of the group exclusive of spouses and dependents, including contracts for which the premiums are paid by a remitting agent for a group, hereinafter referred to as a small group, providing hospital and/or medical benefits, including medicare supplemental insurance, shall be issued in this state unless such contract is community rated and, notwithstanding any other provisions of the law, the underwriting of such contract involves no more than the imposition of a pre-existing condition limitation as permitted by this article. Any individual, and dependents of such individual, and any small group, including all employees or group members and dependents of employees or members, applying for individual or small group insurance coverage must be accepted at all times throughout the year for any hospital and/or medical coverage, including medicare supplemental insurance, offered by the corporation to individuals or small groups in this state. Once accepted for coverage, an individual or small group cannot be terminated by the insurer due to claims experience.

N.Y.Ins.Law § 4317(a).

**7.** The State forecasted that § 4317 alone could destabilize the insurance market further: commercial insurers could choose to abandon the individual and small group market altogether, leaving the non-profits and the HMOs with a surfeit of high risk consumers; HMOs, which,

§ 3233 directs the Superintendent of Insurance to draft a regulation which "include[s] reinsurance or a pooling process involving insurer contributions to, or receipts from, a fund which shall be designed to share the risk of or equalize high cost claims, claims of high cost persons, cost variations among insurers and health maintenance organizations based upon demographic factors of the persons insured which correlate with such cost variations designed to protect insurers from disproportionate adverse risks of offering coverage to all applicants. . . ." N.Y.Ins.Law § 3233(c).[8] This provision is the legal root of Regulation 146 [9] and the basis for the parties' dispute.

Pursuant to § 3233's pooling requirement, Regulation 146, effective on April 1, 1993, establishes two market stabilization mechanisms: a regional demographic pool and a regional high cost medical condition pool. *See* N.Y.Comp.R. & Regs. tit. 11, § 361. The demographic pool relies upon an age/sex morbidity table to determine whether the carrier's subscribers are, for example, older or younger than the average for the region in question.[10] A carrier which has a regionally younger population contributes a weighted amount to the pool; a carrier with a regionally older population collects a proportionally weighted sum from the pool. The demo-

graphic averages are recalculated quarterly to reflect changes in the insurer's subscribers.

Similarly, each carrier also contributes a pre-set amount per subscriber to the high-risk medical pool. Funds are redistributed by the pool's administrator based upon a carrier's population of high-risk subscribers. The medical conditions meriting a refund and the amount consequently refunded are preset by the Superintendent.

Regulation 146 also expressly permits carriers that contribute money into the demographic pool to raise their premium rates based upon the increased expense. N.Y.Comp.Codes R. & Regs. tit. 11, § 361.1(e)(1). According to appellees, most HMOs have obtained rate increases based, in part, on this provision. These rate increases, passed on to the consumer—particularly employee benefit plans—are at the core of appellees' arguments.

Appellees filed suit against the State in March, 1993, claiming that Regulation 146 is preempted by ERISA because it relates to employee benefit plans and is not exempted from preemption by ERISA's savings clause.[11] The Blues intervened as defendants shortly thereafter.

---

pursuant to § 4406(1) (§ 17 of Chapter 501), could not leave either market, would face a sudden expansion of high risk individuals on its insurance rolls; and, the Blues would continue to operate with dangerously low reserves. Section 3233 was devised as a method to encourage commercial insurers to remain in the market, yet assure the survival of non-profits and HMOs.

**8.** Section 3233(c) continues:

[P]rovided that such regulations shall relate only to risk sharing among insurers and health maintenance organizations and shall not create differences in community rates charged by a single insurer because an individual's or a small group's coverage has been reinsured or pooled, and neither the small employer nor the employee shall have reason to know that their coverage has been reinsured or pooled pursuant to such regulations. Such regulations may also include other mechanisms designed to share risks or prevent undue variations in insurer claim costs which are not related to expected differences in insurer costs based upon competition, innovation and efficiency of operation. The regulations may segregate any

reinsurance, pooling or other process among various geographic regions of the state.
N.Y. Ins. Law § 3233(c). Section 3233 became effective on July 16, 1992.

**9.** [T]he superintendent shall promulgate regulations to assure an orderly implementation and ongoing operation of the open enrollment and community rating required by sections [3231, pertaining to commercial insurers,] and [4317, pertaining to other insurers and HMOs], including provisions designed to encourage insurers to remain in or enter the small group or individual health insurance markets. . . .

N.Y. Ins. Law § 3233(a).

**10.** The demographic pool consists, in actuality, of two pools: one for individual and small group health insurance policy carriers, and a second for carriers with Medicare supplement insurance policies. *See* N.Y. Comp.R. & Regs. tit. 11, § 361.3.

**11.** Plaintiff U.S. Healthcare, Inc. filed a separate complaint on March 11, 1993, claiming only ERISA preemption. The District Court consolidated the two cases on March 19, 1993.

In their two count complaint,[12] appellees requested an injunction against the regulation's enforcement. The court granted appellees' motion for a preliminary injunction on April 6, 1993, but required the parties to make pool payments into an escrow account rather than to the pool administrator. Joint App. 387.

On February 25, 1994, the district court issued an oral decision, holding that Regulation 146 is preempted by ERISA and permanently enjoining the enforcement of that regulation. According to the court, the "only question [was] whether the regulation comes within the savings clause." Finding initially that the regulation failed the common sense test for divining whether the regulation regulates the business of insurance, *see Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 740, 105 S.Ct. 2380, 2389, 85 L.Ed.2d 728 (1985), the court then concluded that the regulation failed the tri-part standard for determining whether a practice constitutes the "business of insurance," as articulated in *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982).

> [T]he regulation in question does not spread any risk, it merely shifts costs[;] [n]or does it affect the policy relationship between the insurer and the insured, except insofar as it might have an indirect effect on price[; and,] it is certainly not limited to entities within the insurance industry ... because of its impact on HMO[s].

Joint App. 755–56. Appellants appeal from this decision. Review by this Court is *de novo*.

## I. ERISA'S PREEMPTION CLAUSE

A federal statute preempts a state law if the intent "to occupy the field to the exclusion of the States," *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 209, 105 S.Ct. 1904, 1910, 85 L.Ed.2d 206 (1985), "was the clear and manifest purpose of Congress." *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977).

The federal ERISA statute "comprehensively regulates employee pension and welfare plans." *Metropolitan Life*, 471 U.S. at 732, 105 S.Ct. at 2385. Its preemption clause, widely noted as "conspicuous for its breadth," *FMC Corp. v. Holliday*, 498 U.S. 52, 58, 111 S.Ct. 403, 407, 112 L.Ed.2d 356 (1990), reaches "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." ERISA § 514(a), 29 U.S.C. § 1144(a). Clearly, Congress intended to "establish pension plan regulation as exclusively a federal concern." *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 523, 101 S.Ct. 1895, 1906, 68 L.Ed.2d 402 (1981).

■ In light of Congress's intent, the Supreme Court favors a broad reading of the "relate to" standard. Consequently, a law relates to an employee benefit plan, "in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983). Thus, a law which "provide[s] an alternative cause of action to employees to collect benefits protected by ERISA, refer[s] specifically to ERISA plans and appl[ies] solely to them, or interfere[s] with the calculation of benefits owed to an employee" breaches ERISA's regulatory reach. *Aetna Life Ins. Co. v. Borges*, 869 F.2d 142, 146 (2nd Cir.), *cert. denied*, 493 U.S. 811, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989). Furthermore, ERISA's preemptive breadth encompasses even a law of general applicability if it has an impermissible effect on an ERISA plan. *See Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 139, 111 S.Ct. 478, 483, 112 L.Ed.2d 474 (1990) (noting that ERISA may preempt a state regulation "even if the law is not specifically designed to affect such plans, or the effect is only indirect") (citing *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47, 107 S.Ct. 1549, 1553, 95 L.Ed.2d 39 (1987)). *But see Aetna Life*, 869 F.2d at 146 (explaining that laws of general application, which are "often traditional exercises of state power or

---

12. The District Court did not address plaintiff-appellees' argument in Count Two that Regulation 146 is preempted by the Federal Employees Health Benefits Act, 5 U.S.C. § 8901 *et seq.* ("FEHBA").

regulatory authority," are not preempted if their effect upon ERISA plans is incidental).

■ Regulation 146, appellants argue, is a state law of general applicability and any effect it has on ERISA-regulated plans is too tenuous and insubstantial to merit preemption. Appellees, on the other hand, contend that Regulation 146 is a law of specific applicability because it expressly refers to employee benefit plans; therefore, preemption is automatic. Second, even if the Court finds that the regulation is a law of general applicability, appellees assert, it has a connection to employee benefit plans because the cost of the pool payments, passed from the HMOs to their customers, will have a direct adverse impact on ERISA-regulated funds. Faced with higher rates, these employee benefit programs will be forced to either raise their premium fees or decrease the range of benefits available. ERISA is designed, appellees argue, precisely to avoid such an effect.[13]

### A. "Reference To" an ERISA Plan

■ State laws that refer to employee benefit plans fall within ERISA's preemptive scope. *See, e.g., District of Columbia v. Greater Washington Bd. of Trade,* — U.S. —, —, 113 S.Ct. 580, 583, 121 L.Ed.2d 513 (1992) (*"Greater Washington"*) (finding

that the act "specifically refers to welfare benefit plans regulated by ERISA and on that basis alone is preempted"); *Mackey v. Lanier Collection Agency & Service, Inc.,* 486 U.S. 825, 829, 108 S.Ct. 2182, 2185, 100 L.Ed.2d 836 (1988) (noting that "a state statute's express reference to ERISA plans suffices to bring it within the federal law's preemptive reach"). Once a statute is found to have a reference to an ERISA plan, the statute is preempted automatically; no further analysis of the "connection with" standard is required. *See New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* — U.S. —, —— ——, 115 S.Ct. 1671, 1680–81, 131 L.Ed.2d 695 (1995) (*"Travelers"*) (commenting that when a state law refers to an ERISA plan, there is "no reason to distinguish between the effects on insurers that are sufficiently connected with employee benefit plans to 'relate to' the plans and those effects that are not").

Loosely defined, *Shaw*'s "reference to" prong may be read to include statutes which merely "make mention" or "allude" to ERISA plans.[14] Such a reading, however, over-extends ERISA's preemptive scope because § 514(a) preempts only those laws which "relate to" ERISA.[15] Therefore, the

---

**13.** Appellees also argue that the pooling arrangement, which diverts employee benefit funds to non-plan participants, is impermissible. According to appellees, such diversion facially violates ERISA because a plan administrator who permits the disbursement of funds to a pool violates her fiduciary duty.

  [A] fiduciary shall discharge his duties with respect to a plan in the interest of the participants and beneficiaries and[ ] for the exclusive purpose of[ ] providing benefits to participants and their beneficiaries.

29 U.S.C. § 1104(a)(1)(A)(i). Appellants reply that when employee benefit plans make payments to an HMO, those funds are not segregated for the exclusive use of the plan participants; rather, the HMO may use those funds in its everyday operations to benefit all of its consumers. *See United Wire, Metal & Machine Health & Welfare Fund v. Morristown Memorial Hospital,* 995 F.2d 1179, 1195–96 (3rd Cir.) (finding that "an ERISA plan meets its ERISA responsibilities when it pays whatever portion of the price charged by the health care provider the plan has assumed"), *cert. denied,* — U.S. —, 114 S.Ct. 382, 126 L.Ed.2d 332 (1993). The Court agrees that there exists no appreciable difference between the use of plan funds by the insurer's own

non-ERISA subscriber pool and the use of such funds by the larger Regulation 146 subscriber pool. In both cases, the plan administrator's fiduciary duty is realized when she submits the required payments to the insurer pursuant to the benefits contract.

**14.** *See American Heritage Dictionary* 1517 (3d ed. 1992) (defining the word "reference" to include "to make mention" and "to allude," but noting that the three words are not synonymous).

**15.** A rule that permitted courts to preempt statutes that simply mention or allude to ERISA plans also would produce untenable results.

  [W]e disagree with the plans' argument that Chapter 83 is preempted simply because it expressly refers to "self-funded union" plans as one example of a 'third party payor.' Where, as here, a reference to an ERISA plan can be excised without altering the legal effect of a statute in any way, we believe the reference should be regarded as without legal consequence for § 514(a) purposes. Thus, for example, a state statute providing that "no employer, including an ERISA plan, shall discriminate on grounds of race or gender" would not

"reference to" prong—derived, in fact, from *Black's Law Dictionary*'s definition of the word "relate" [16]—must be read to imply a relationship between the state law and ERISA plans.[17]

Furthermore, despite statements alluding to a stricter standard, the Supreme Court has never found a statute to be preempted simply because the word ERISA (or its equivalent) appears in the text. In *Greater Washington*, for example, the preempted worker's compensation statute required employers to provide to certain disabled employees health insurance coverage " 'equivalent to the existing health insurance coverage' " provided by the employer. —— U.S. at ——, 113 S.Ct. at 584 (quoting D.C.Code Ann. § 36–307(a–1)(1) and (3) (Supp.1992)). Although the Court's first response is to comment that the statute "specifically refers to welfare benefit plans regulated by ERISA and on that basis alone is preempted," it continues in the same paragraph to observe that, to comply, employers had to evaluate

employee benefits under their existing ERISA plan and then use those figures to calculate the benefits due to disabled employees. *Id.*, —— U.S. at —— ——, 113 S.Ct. at 583–84. The interaction such compliance requires between the act and ERISA plans, the Court finds, forms a relationship between the two texts that is inconsistent with federal law.[18]

■ Accordingly, a state law has a reference to ERISA if its text mentions or alludes to ERISA plans, and if the law affects ERISA plans in some manner. *Accord United Wire*, 995 F.2d at 1192 n. 6 ("[T]he test for preemption ... is whether the existence of ERISA plans is necessary for the statute to be meaningfully applied.").

■ Regulation 146 defines "small group health policy" to include "a group remittance policy written by a carrier pursuant to Section 4304 of the Insurance Law and a group health insurance policy covering from 3 to 50 employees or members, exclusive of depen-

---

be preempted despite its reference to an ERISA plan.
*United Wire*, 995 F.2d at 1192 n. 6. *See also In re Dyke*, 943 F.2d 1435, 1448 n. 35 (5th Cir.1991) ("Aside from statutory exceptions, a commonsense exception to this rule may be appropriate in a case in which a state law mentions ERISA benefits plans, but does not affect ERISA benefit plans.").

16. "To stand in some relation; to have bearing or concern; to pertain; to refer; to bring into association with or connection with."
*Shaw*, 463 U.S. at 97 n. 16, 103 S.Ct. at 2900 n. 16 (quoting *Black's Law Dictionary* 1158 (5th ed. 1979)). The "connection with" prong is derived from the same source. *See Shaw*, 463 U.S. at 97, 103 S.Ct. at 2900.

17. In light of the prongs' shared genesis, it is not clear that the *Shaw* Court intended the test to have two thoroughly separate prongs. Many courts, in fact, seem to merge the tests in application. In *Metropolitan Life*, for example, the statute required insurers to provide minimum mental-health-care benefits in all policies issued to " 'any employees' health and welfare fund which provide[s] hospital expense and surgical expense benefits.' " 471 U.S. at 730 n. 11, 105 S.Ct. at 2384 n. 11 (quoting Mass.Gen. Laws Ann., ch. 175, § 47B (West Supp.1985)). Although the statute's language clearly alludes to an ERISA plan, the Court simply concludes that the law "as applied relates to ERISA plans" because it "bears indirectly but substantially on all insured benefit plans, for it requires them to

purchase the mental-health benefits specified in the statute...." *Id.* at 739, 105 S.Ct. at 2389.

Merger, however, particularly following *Travelers*, is inappropriate. According to the Court in *Travelers*, because the *Metropolitan Life* statute referred to ERISA plans, "there was no reason to distinguish with any precision between the effects on insurers that are sufficiently connected with employee benefits plans to 'relate to' the plans and those effects that are not." *Travelers*, —— U.S. at —— —— ——, 115 S.Ct. at 1680–81. Therefore, unlike the "reference to" prong, where the magnitude of the statute's effect is not an issue, under the "connection with" prong, the court must measure the supposed effect upon the plan to determine whether the effect is sufficiently disruptive to ERISA plans to merit preemption.

18. *See also Ingersoll–Rand*, 498 U.S. at 139–40, 111 S.Ct. at 483–84 (finding that the state's wrongful discharge law required a court to interact impermissibly with an ERISA plan); *FMC*, 498 U.S. at 52, 111 S.Ct. at 404 (finding that the statute referred to ERISA and that it "also ha[d] a 'connection' to ERISA benefit plans ... [because it] subject[ed] plan administrators to conflicting state regulations"); *Mackey*, 486 U.S. at 829–30, 108 S.Ct. at 2185–86 (holding that the "statute's express reference to ERISA plans suffice[d]" for preemption because the statute was " 'specifically designed to affect employee benefit plans' ") (quoting *Pilot Life*, 481 U.S. at 47–48, 107 S.Ct. at 1552–53).

dents and spouses...." N.Y.Comp.Codes R. & Regs. tit 11, § 361.2(o).[19]

The regulation's use of the word employee to modify group health insurance policy implicates ERISA. ERISA comprehensively regulates employee welfare plans, defined as "any plan, fund or program ... established or maintained by an employer or by an employee organization ... to the extent that such plan ... is maintained for the purpose of providing ... medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability [or] death." ERISA § 3(1), 29 U.S.C. § 1002(1)). Employee group health insurance policies fall within this definition. *See, e.g., Greater Washington,* — U.S. at —, 113 S.Ct. at 584 (equating the phrase " 'existing health insurance coverage of the employee' " to "welfare benefit plans regulated by ERISA") (quoting D.C.Code Ann. § 36–307(a–1)(1) and (3) Supp.1992)).[20]

Regulation 146's allusion to ERISA, however, is not tantamount to a reference because the regulation can be applied without guidance from or interference with an ERISA plan. First, the calculation of an insurer's pool contributions or reimbursements is undisturbed by the presence, or absence, of an ERISA plan. Regulation 146 obliges insurers to calculate their contributions (or reimbursements) based upon that insurer's membership population, not on the benefits provided to those members under an ERISA plan. Whether any member purchases his policy through an employee benefit plan or directly from the insurer is mean-

ingless; only the member's physical characteristics—his age and gender—are relevant.

Second, Regulation 146 is unconcerned with the contents of an insurer's benefits package. Although an insurer may choose to manipulate its membership roster by manipulating its benefits packages, Regulation 146 does not require any such changes; each insurer is free to offer the identical benefits it offered prior to the regulation's enactment.[21]

### B. Connection With an ERISA Plan

■ Absent a reference to ERISA, a law still may be found to relate to ERISA if it has a connection with employee welfare benefit plans. A law is connected impermissibly to ERISA plans if it has "an effect on the primary administrative functions of benefit plans, such as determining an employee's eligibility for a benefit and the amount of that benefit." *Aetna Life,* 869 F.2d at 146–47. *See also General Electric Co. v. New York State Department of Labor,* 891 F.2d 25, 29 (2nd Cir.1989) (stating that a "connection exists where a state statute prescribes either the type and amount of an employer's contributions to a plan, ... the rules and regulations under which the plan operates ... or the nature and amount of the benefits provided thereunder....") (citations omitted), *cert. denied,* 496 U.S. 912, 110 S.Ct. 2603, 110 L.Ed.2d 283 (1990). If a connection is found, preemption generally is compelled unless the effect on the plan is "too tenuous, remote, or peripheral ... as is the

---

**19.** "Employee" appears again in the regulation's Table of Age/Sex Factors (For other than Medicare Supplement Insurance). There, the word employee is used in an explanatory parenthetical following the phrase Family Units With Dependents Coverage: "(e.g. Employee plus Spouse and Children)." N.Y. Comp.Codes R. & Regs. tit. 11, § 361.3(c)(1). The Court attaches no consequence to this use.

**20.** Courts have found much subtler word choices to refer to ERISA. In *FMC,* for example, the Court observes that the phrase "but [are] not limited to," in association with the phrase "[a]ny program, group contract or other arrangement for payment of benefits"—each phrase appearing in separate statutory sections—refers to ERISA. 498 U.S. at 59, 111 S.Ct. at 408.

**21.** Furthermore, although the regulation uses the word "employee" in its small group health policy definition, that use neither expands nor limits the group of providers to which the statute applies. The phrase "employees or members" permits the modifiers "employee" and "member" to be read in the alternative: a "group health insurance policy covering from 3 to 50 employees," or a "group health insurance policy covering from 3 to 50 ... members." The word "members", however, does not exclude the group "employees"; every person for whom the insurance policy is purchased, whether he is or is not an employee, is a member of the small group. Thus, although an unnecessary measure, the word "employee" may be excised from Regulation 146 without legal effect.

case with many laws of general applicability." *Shaw*, 463 U.S. at 100, 103 S.Ct. at 2901.

▮ Regulation 146's demographic pooling provision requires all New York insurance carriers with fewer high-risk or elderly consumers than the regional average to contribute money into an independently administered fund. Many HMOs, to which Regulation 146 expressly applies, are among those carriers which have statistically younger and less risky members than other carriers. The Blues, on the other hand, cater to statistically older and less healthy consumers. Consequently, HMOs, together with other similarly situated carriers, initially will support the fund from which the Blues will draw compensation.

Mindful that financial disbursements under the demographic pooling mechanism could deplete the HMOs' corporate reserves, the legislature built into Regulation 146 a provision designed to simplify the process for obtaining rate increases under Article 43 of the New York Insurance Code.[22] Accordingly, any carrier that must contribute money into the demographic pool may "include [its] projected contributions in [its] premium rates as if the contributions were claims expenses...." N.Y.Comp.R. & Regs., tit. 13, § 361.1(e)(1).[23] Most HMOs have used these simplified procedures to obtain rate increases based, in part, on their anticipated contributions to this pool.[24]

Employee benefit plans or funds are among those customers whose rates are affected by § 361.1(e)(1). Faced with increased rates, those plans must either pass the rate increases on to their customers or circumscribe the benefits which had been offered at the previous, lower rate. Thus, the cost of Regulation 146 is borne ultimately by the individual insureds, the majority of whom purchase health care insurance through employee benefit plans. *See New England Health Care Employees Union District 1199 v. Mount Sinai Hosp.*, 846 F.Supp. 190, 195 (D.Conn.1994) ("According to current United States census data, 70 percent of all privately-insured persons are covered by ERISA plans.").

The surcharges' effect on insurers reflects the legislature's design: to make competing insurance plans less attractive than the Blues by increasing their cost to the consumer. However, by forcing insurers to raise their rates to cover the cost of the surcharges, the state indirectly forces ERISA plans to either increase plan costs, reduce benefits or change insurers. This result, appellees argue, creates an impermissible connection between Regulation 146 and ERISA plans.

The Supreme Court's recent analysis of ERISA's preemptive scope in *Travelers*, however, forecloses appellees' argument. In *Travelers*, the state, similarly motivated by the Blues' financial crisis, devised a plan by which hospitals would collect a surcharge—in addition to the pre-set diagnostic-related-group ("DRG") fee schedule otherwise permitted—from commercial insurers and HMOs. To compensate for the higher hospital fees, insurers affected by the state's surcharge scheme raised their premium rates to cover the additional expenses. Consequently, the Blues, exempted from the surcharges, became economically more attractive as insurers because they offered relatively cheaper policies. As a result, the surcharges encouraged ERISA plans to transfer coverage

---

**22.** Article 43 corporations, which include the Blues, commercial insurers and HMOs, must obtain prior approval of their premium schedules from the Superintendent of Insurance. After a public hearing is held, the Superintendent may order an audit of the petitioning corporation and may direct the corporation to implement any recommendation resulting from that audit prior to issuing a final decision. N.Y. Ins. Law § 4308.

Although neither party details the effect of § 361.1(e)(1) on § 4308, U.S. Healthcare's Complaint, filed in the district court under docket number 93–CV–1487 and later consolidated with the underlying action, avers that "the New York Insurance Department ... established special procedures for ... HMOs and insurers to increase rates sufficient to generate the necessary income to meet their obligations under the Pooling Provisions." Joint App. at 44–45.

**23.** Regulation 146 does not permit carriers to pass on to consumers the cost of their contributions to the high-risk pool.

**24.** During the first two quarters of 1994, HMOs contributed approximately $30 million to the escrow fund established pursuant to the district court's order.

to the Blues to avoid paying higher premiums.

Certainly, as the Court found, the manipulation of health care prices affects ERISA plans.

> Although there is no evidence that the surcharges will drive every health insurance consumer to the Blues, they do make the Blues more attractive (or less unattractive) as insurance alternatives and thus have an indirect economic effect on choices made by insurance buyers, including ERISA plans.

*Travelers,* —— U.S. at ——, 115 S.Ct. at 1679. Congress's intent, however, was not to foreclose every state action with a conceivable effect upon ERISA plans, but to maintain exclusive federal control over the regulation of such plans. The health care price manipulation at issue in *Travelers* does no harm to the latter.

> An indirect economic influence ... does not bind plan administrators to any particular choice and thus function as a regulation of an ERISA plan itself; commercial insurers and HMOs may still offer more attractive packages than the Blues. Nor does the indirect influence of the surcharges preclude uniform administrative practice or the provision of a uniform interstate benefit package if a plan wishes to provide one. It simply bears on the costs of benefits and the relative costs of competing insurance to provide them. It is an influence that can affect a plan's shopping decisions, but does not affect the fact that

any plan will shop for the best deal it can get. . . .

*Id.*[25] In other words, an indirect economic effect upon ERISA plans generally provides a connection too "tenuous, remote or peripheral" to justify preemption.[26] *Id.,* —— U.S. at ——, 115 S.Ct. at 1680 (quoting *Shaw,* 463 U.S. at 100 n. 21, 103 S.Ct. at 2901 n. 21).

Here, Regulation 146's effect on ERISA plans is no less indirect. By increasing the relative cost of avoiding the high-risk market, the regulation creates an incentive for insurance companies either to raise their rates to meet the cost of pool contributions or to attract enough high risk members to avoid payments to the pool. In either case, however, the benefits package insurers offer to ERISA plans depends not upon the pooling provision, but upon the insurer's own cost-benefit analysis. Regulation 146 merely adds another factor to the same equation insurers balance daily.

Furthermore, an insurer's analysis presumably will take into account the more important factor in this Court's decision that Regulation 146 is not connected to ERISA plans: that, however insurers choose to proceed, ERISA plans remain free to make a similar cost-benefit analysis and to choose a more competitive alternative. Thus, the only link Regulation 146 has with ERISA plans is its indirect effect on rate diversification among insurers. As the *Travelers* Court noted, however, such an effect is immaterial for preemption purposes because insurance "cost-uniformity was almost certainly not an object of preemption." —— U.S. at ——, 115 S.Ct. at 1680.[27]

---

**25.** According to the Court, a contrary result would be absurd: every state action concerning hospitals, from quality control standards to the regulation of employment conditions, affects the prices hospitals set for medical care. *Travelers,* —— U.S. at ——, 115 S.Ct. at 1679–80. Likewise, virtually any state action involving insurers or health care—traditional exercises of state power—affects the insurance rates.

**26.** An indirect economic impact upon ERISA plans is sufficient to trigger preemption, however, if it "produce[s] such acute ... economic effects, by intent or otherwise, as to force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers...." *Travelers,* —— U.S. at ——, 115 S.Ct. at 1683. Neither acute result is evident

here. At most, the pooling provision will cause insurers to alter their relative pricing schedules to reflect a different cost per benefit ratio. Even if an insurer radically changes that ratio, the effect upon ERISA plans still will be minimal because, like any other customer, the plan simply will shop for a better deal.

**27.** If, for example, a State were to regulate sales of insurance by commercial insurers more stringently than sales by insurers not-for-profit, the relative cost of commercial insurers would rise; we would nonetheless say, following *Metropolitan Life,* that such laws "do not 'relate to' benefit plans in the first instance."
*Travelers,* —— U.S. at ——, 115 S.Ct. at 1681 (quoting *Metropolitan Life,* 471 U.S. at 741, 105 S.Ct. at 2390).

In sum, Regulation 146 is not related to ERISA plans because it has neither a reference to nor a connection with those plans. Although the regulation contains an allusion to ERISA plans, that allusion does not associate the regulation with the plans' administration, enforcement or policy compositions. Additionally, because ERISA's preemption clause is not intended to reach state actions which impact only upon the relative cost of insurers' products, Regulation 146 is not connected with ERISA. Therefore, preemption is inappropriate under ERISA's § 514(a).

### III. FEHBA

Appellees also claim that Regulation 146 is preempted by the Federal Employees Retirement Income Security Act of 1974 ("FEBHA"), 5 U.S.C. §§ 8901–8914 (1988 & Supp. IV 1992). The District Court made no findings as to this claim by appellees. Therefore, appellees' FEHBA claim is remanded to the District Court for further findings.